IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 7, 2025 Session

**STATE OF TENNESSEE v. ALAN JOHNSON**

**Appeal from the Criminal Court for Shelby County**
No. 19-04596       Lee V. Coffee, Judge
_____

**No. W2024-00747-CCA-R3-CD**
_____

After a second jury trial in the Shelby County Criminal Court, the Defendant, Alan Johnson, was convicted of two counts of first degree felony murder, one count of aggravated child abuse, and one count of aggravated child neglect.  The trial court sentenced him to life for each murder conviction and merged those convictions.  The trial court sentenced him to twenty-five years each for the aggravated child abuse and aggravated child neglect convictions, Class A felonies, and ordered that he serve all of the sentences consecutively for a total effective sentence of life plus fifty years.  On appeal, the Defendant claims that (1) the evidence is insufficient to support the convictions; (2) his second trial violated double jeopardy; (3) the trial court erred by denying his motion to suppress his statement to police; (4) the trial court committed plain error by allowing a medical examiner to testify about the victim's autopsy report when the witness did not prepare the report; (5) the State's prosecutorial misconduct during cross-examination of the defense's expert witness constituted plain error; (6) the trial court erred by not admitting his entire 911 call into evidence; (7) the trial court's denial of his request to have retained counsel represent him on his motion for new trial violated his constitutional right to counsel of choice; (8) his effective sentence is excessive; and (9) he is entitled to relief based on cumulative error.[1]  Upon our review, we conclude that the evidence is insufficient to support the conviction of first degree felony murder in the perpetration of aggravated child neglect and that the trial court incorrectly ordered the Defendant to serve one hundred percent of his sentence for aggravated child neglect.  Therefore, the Defendant's conviction of first degree felony murder in the perpetration of aggravated child neglect in count four is reversed, and the case is remanded to the trial court for correction of the judgment for aggravated child neglect in count three.  The Defendant's remaining convictions and effective sentence of life plus fifty years are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Reversed in Part, Case Remanded**

_____

[1] We have chosen to address the issues in a different order than the order presented in the Defendant's brief.

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J., and TIMOTHY L. EASTER, J., joined.

William D. Massey and Joseph A. McCluskey (on appeal) and Kamilah E. Turner (first and second trial) and Meigan Thompson (second trial), Memphis, Tennessee, for the appellant, Alan Johnson.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Steve J. Mulroy, District Attorney General; and Dru Carpenter and Eric Christensen, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case relates to the October 2018 beating death of two-year-old D.M.[2]  On July 11, 2019, the Shelby County Grand Jury returned a four-count indictment, charging the Defendant with aggravated child abuse in count one, first degree felony murder in the perpetration of aggravated child abuse in count two, aggravated child neglect in count three, and first degree felony murder in the perpetration of aggravated child neglect in count four.  The Defendant went to trial in September 2022.  On the third day of testimony, the trial court granted defense counsel's motion to stop the trial and discharged the jury.  The Defendant went to trial for the second time in January 2024.

Countess Givens, the State's first witness at the second trial, testified that in October 2018, she was the Director of First Step Learning Academy on East Crump Road in Memphis.  The two-year-old victim had been attending the daycare for about one year. Ms. Givens described him as "a sweet boy.  Quiet.  Very, very timid[.]"  The victim liked to play with toy blocks, but he was not known to climb on things and did not like to be tossed into the air.  The victim's mother usually dropped him off in the mornings.  The victim's mother or the Defendant, who was dating the victim's mother, usually picked him up in the afternoons.  The victim's father picked him up from the daycare a few times.  On October 10, 2018, the victim's mother signed him into the daycare at 7:50 a.m., and the Defendant signed him out at 4:08 p.m.

Ms. Givens testified that she last saw the victim about 1:30 p.m. on October 10 and that "everything was fine, he was playing, he had a good day[.]"  The defense played a video for Ms. Givens, and she acknowledged that the video showed an adult holding the

_____
[2] It is the policy of this court to refer to minor victims by their initials.

- 2 -

victim's hands, the victim walking up the adult's chest, and the victim playfully flipping over while the adult held the victim's hands.

Keyona Hence testified that she was the victim's teacher the entire time he attended First Step and that the victim was shy until he got to know a person but was also happy and playful. The victim's mother, the victim's father, or the Defendant picked him up from the daycare in the afternoons. Ms. Hence said that if the victim's mother picked him up from the daycare, he was ready to go home and would run to his mother and would give her kisses. If the victim's father picked him up, the victim would run to him and would hug him. If the Defendant picked him up, the victim "would always hesitate about leaving" and would grab Ms. Hence before deciding to go with the Defendant.

Ms. Hence testified that in October 2018, the victim was potty training and was still wearing disposable diapers. On the afternoon of October 10, the Defendant arrived at the daycare to pick up the victim. Ms. Hence said that the victim did not want to leave and that "[i]t's like he was doing everything he could not to go out that door." She said the victim finally went outside with the Defendant but "went back to the [glass] doors like he didn't want us to let him go. He was beating on the door, trying to get us to bring him back, but he was already out the door at that point." The door was locked, so the victim could not get back inside. Ms. Hence did not see the victim again.

Neil Lovett, a fireman and emergency medical technician with the Memphis Fire Department, testified that at 5:56 p.m. on October 10, 2018, his fire station was dispatched to a house on Kings Arms Street in response to a call that a two-year-old child was in cardiac arrest. When the fire truck arrived at 6:00 p.m., the firemen grabbed their equipment and walked up the driveway. The Defendant let them into the house through the back door. Mr. Lovett said that he did not remember why they entered through the back of the home but that they went into a den-like room that was "almost pitch dark." The Defendant pointed to the victim, who was lying on the floor. The victim was not breathing and did not have a pulse. Mr. Lovett and another fireman alternated working on the victim with Mr. Lovett performing cardiopulmonary resuscitation ("CPR") and the other fireman using a "bagging" device to push oxygen into the victim's lungs.

Mr. Lovett testified that the firemen asked the Defendant what happened to the victim and that the Defendant said he was playing with the victim by tossing the victim into the air. Mr. Lovett said the Defendant claimed that the victim was "liking it, giggling" but that "one of the times he tossed him up, when he came back down, he was limp." Mr. Lovett described the Defendant's explanation as "kind of vague." When an ambulance arrived, Mr. Lovett's supervisor picked up the victim and rushed him to the ambulance. Mr. Lovett continued performing CPR on the victim in the ambulance while en route to the hospital. At some point, the victim regained a carotid pulse but still was not breathing.

Mr. Lovett identified two methods of performing CPR on a child: the two-finger method and the circumferential method. He explained that for the two-finger method, two fingers were placed on the child's chest, near the nipple line, and were pushed on the chest at one hundred twenty beats per minute. For the circumferential method, a person used the thumbs to push on the child's chest. Mr. Lovett stated that a child's sternum could be injured during CPR, but that injury was uncommon.

On cross-examination, Mr. Lovett testified that the firemen from his station were the first responders on the scene; the ambulance arrived six minutes later. Mr. Lovett had been a fireman only two months at the time of the call, and his performing CPR on the victim was only his first or second time administering CPR to a child. He said he remembered the victim's case very vividly because "the whole thing kind of just felt off."

On redirect-examination, the State asked Mr. Lovett what he meant by "felt off." He explained:

A lot of times when we -- when we make any kind of pediatric call, especially something it being -- it came across for us as cardiac arrest, usually when we arrive on scene, there is a -- it's pretty frantic.

And I'd say probably 8, 9 times out of 10, the person has got the baby in the front yard and they're in full panic mode.

And so when we kind of had to go all the way up the driveway, to the back, and then kind of came in and it just being dark, it just -- it felt off for no other reason than just kind of like usually someone is providing more information a little bit quicker than that or is, I guess, more frantic for us to immediately be helping out in the front yard.

The State asked Mr. Lovett if any of the firemen changed the victim's diaper or moved his diaper to a different part of the house, and Mr. Lovett answered, "No. We wouldn't have done that."

Officer Teresa Jefferson with the Memphis Police Department ("MPD") testified that on October 10, 2018, she responded to a call of an unresponsive child at a home on Kings Arms Street. When she arrived, the victim was in an ambulance. Officer Jefferson knocked on the door of the home, but no one answered. She entered the home; called out for someone to come to the door; and saw the Defendant coming from a back room, which turned out to be a bathroom. Officer Jefferson began her investigation. She said that she allowed the Defendant to move about freely and that he kept "running around." After the

- 4 -

ambulance left with the victim, Officer Jefferson received information about the victim's condition and "detained" the Defendant in the back of her patrol car.

On cross-examination, defense counsel asked Officer Jefferson if the Defendant was "emotional." Officer Jefferson responded, "He was all over the place. I mean, I don't know what his emotions [were]." Officer Jefferson then acknowledged testifying previously that the Defendant was "emotional." Defense counsel played Officer Jefferson's body camera video to refresh her recollection of what she observed about the Defendant's demeanor, and Officer Jefferson said he looked like he needed to use the restroom. The Defendant used his cellular telephone in Officer Jefferson's presence and told the person to whom he was speaking, who turned out to be the victim's mother, to come to his house.

On redirect-examination, Officer Jefferson testified that the Defendant was outside at some point. When she later tried to find him, she discovered that he had gone back inside the house. The victim was still in the ambulance at that time.

Major Nathaniel Jones with the MPD testified that on October 10, 2018, he responded to Le Bonheur Children's Hospital in response to an accidental injury call. When he arrived, he spoke with medical personnel and learned about the victim's injuries. The victim's mother was present and was "very upset, distraught, sad, and just crying a lot." Major Jones said he was not prepared for the extent of the victim's injuries because he thought he was responding to a call with "just the kid maybe having bumps or bruising, just playing, something minor." On cross-examination, Major Jones acknowledged that he saw twelve people attending to the victim and that one of them was performing CPR.

Henry Hearns testified that in October 2018, he was a crime scene investigator with the MPD. On October 10, Investigator Hearns was dispatched to a home on Kings Arms Street to take photographs, prepare sketches, and collect evidence. He entered the home through the back door and went into the den or family room. A child's gray t-shirt, turned inside out, was on the floor. When Investigator Hearns turned the shirt right side out, he saw stains, possibly vomit or food, on the front. A bathroom was next to the den. Investigator Hearns found a pull-up diaper on the bathroom floor, and red stains were in the diaper. The diaper field tested positive for the presence of blood.

Investigator Hearns testified that a shed was in the backyard and that a barstool was tipped over outside the shed. A sign on the outside of the shed read, "'[K]eep out. If you can read this, you are in range.'" Investigator Hearns went inside and saw another sign that read, "'Welcome to the man cave.'" A television and a couch were inside the shed, and a set of car keys was on the couch. Investigator Hearns also saw a pack of baby wipes, snacks, toddler toys, and a pack of pull-up diapers. A toddler's red tennis shoe was on the

floor. On cross-examination, Investigator Hearns testified that he arrived at the home at 8:16 p.m. and that police officers had entered the shed before he arrived.

Geandra Meeks, the victim's mother, testified that she met the Defendant in September 2016 when the victim was six months old and that they began dating. The Defendant was married, but Ms. Meeks did not know he was married at that time. The Defendant later separated from his wife. Ms. Meeks said that the Defendant was always "gentle" with the victim and that she never saw him toss the victim into the air. Ms. Meeks saw the victim's father toss the victim into the air one time, but the victim did not like it. Ms. Meeks identified the video of the victim walking up an adult's chest and flipping over. She said the adult was her best friend's husband.

Ms. Meeks testified that the Defendant had a son, who was one year older than the victim. The Defendant also had two teenage children with his wife, and the Defendant's wife and teenagers still lived with him in the house on Kings Arms Street. Ms. Meeks and the victim would visit the Defendant in his "man cave," which was a shed behind the Defendant's home, but they never went into the Defendant's house.

Ms. Meeks testified that in the fall of 2018, the Defendant would pick up the victim from daycare and would babysit him in the shed while Ms. Meeks was at work. Ms. Meeks did not have any concerns about the Defendant and trusted him. The victim was "struggling" with potty training and was still wearing disposable diapers, not pull-up diapers. The Defendant's three-year-old son was potty trained, and the Defendant thought the victim should have been potty trained by that time.

Ms. Meeks testified that on the morning of October 10, she dropped off the victim at daycare and went to work. The victim was wearing a gray shirt, jean shorts, and red tennis shoes, and Ms. Meeks identified the victim's gray shirt and red tennis shoe found by Investigator Hearns. The previous week, Ms. Meeks's mother had "nicked" the victim's scalp behind his left ear while giving him a haircut. The cut was small and had scabbed over by October 10. The victim did not have any other injuries.

Ms. Meeks testified that later that day, she received a telephone call at work from the Defendant, telling her "that he was detained and that he had an accident." Ms. Meeks learned the victim was at Le Bonheur. She went to the hospital, where a doctor told her "what was going on and that it wasn't looking good for [the victim]." The victim was in the intensive care unit, and Ms. Meeks saw medical personnel performing CPR on him. The CPR "looked really painful," so Ms. Meeks asked them to stop. Machines kept the victim alive, but Ms. Meeks later had the machines disconnected.

On cross-examination, Ms. Meeks testified that at some point during her relationship with the Defendant, she confronted him about being married. The Defendant proceeded to obtain a legal separation from his wife, but his wife and their two teenage children continued to live with him. Ms. Meeks and the Defendant had a good relationship, she did not experience any domestic violence with him, and he loved and cared for the victim. Ms. Meeks and the victim sometimes spent the night in the shed behind the Defendant's house. The State asked Ms. Meeks about the toys and pull-up diapers found inside the shed and the bar stool found tipped over outside the shed. She said that the toys and pull-up diapers belonged to the Defendant's three-year-old son, not the victim, and that the bar stool was usually inside the shed.

Ms. Meeks testified that the Defendant "sounded really frantic" when he telephoned her on October 10. She asked him about the victim and heard a police officer say the victim had been taken to Le Bonheur.

Special Agent Lawrence James with the Tennessee Bureau of Investigation ("TBI") testified as an expert in DNA analysis that he analyzed the pull-up diaper collected from the bathroom. Reddish-brown stains were in the crotch area of the diaper. The stains were blood and matched the victim's DNA profile.

Dr. Karen Lakin, a physician and expert in general and child abuse pediatrics, testified that in October 2018, she was the Medical Director for the Le Bonheur Care Team, which was responsible for evaluating children suspected of being abused. On October 10, a social worker notified Dr. Lakin that a child was coming to the hospital in such extreme critical condition that he might not survive. When the victim arrived in the emergency department, he had to be resuscitated, and his temperature was just eighty-eight degrees, indicating hypothermia.

Dr. Lakin testified that she evaluated the victim the next day and that he had numerous external physical injuries: bruising on his right forearm, bruising and abrasions on his right flank, pattern bruising across his abdomen, "a little bit of discoloration" around his right eye and temple, bruising on the bottom of his right foot that extended to his heel, a small abrasion over his sternum, bruising on his left arm, and an abrasion on the top of his nose. A CT scan of his head revealed a left occipital skull fracture, a left subdural hemorrhage, a right subarachnoid hemorrhage, and soft tissue swelling of his scalp. A CT scan of his abdomen detected healing and recent fractures in his clavicle and ribs; a possible injury to his right ureter, which was the tube from the kidney to the bladder; a laceration in his liver; and a laceration in his spleen. Dr. Lakin said blunt force trauma to the abdomen could cause a liver laceration. The lacerations in the victim's liver and spleen were each less than three centimeters in length.

Dr. Lakin testified that an eye examination revealed multiple retinal hemorrhages behind both eyes. The victim also suffered compression fractures to the vertebral endplates of his spine, which Dr. Lakin said were caused by "severe bending at the spinal level." After the victim's death, a skeletal survey showed a healing fracture in his right wrist and showed fractures around the finger joints in both hands. The finger fractures were the result of "twisting torsion." Dr. Lakin said that the fractures in the victim's left ribs, wrist, and clavicle were in different stages of healing. The victim had three recent fractures in his right ribs, and there was no evidence of healing in those fractures. Dr. Lakin said that CPR could not have caused the recent rib fractures, which were posterior and lateral, because the fractures were "in the wrong location for CPR or what's typical for CPR." Additionally, the method for performing CPR on a toddler, i.e., two-finger compressions over the sternum, made rib fractures unlikely. She said the victim's rib fractures would have been painful and would have caused him to be "fussier than usual and clingy." Dr. Lakin identified photographs of the victim's injuries that were taken while he was at Le Bonheur.

Dr. Lakin testified that she spoke with Ms. Meeks and that Ms. Meeks told her the following: The Defendant said he picked up the victim from daycare and took him to the Defendant's home. The Defendant was playing outside with the victim by throwing him into the air and catching him. The Defendant "missed" the victim but caught him by his legs. The Defendant pulled the victim up before the victim's legs hit the ground, but the victim became unconscious.

Dr. Lakin testified that, in her opinion, the Defendant's story did not explain the victim's extensive injuries. Although the Defendant claimed the victim's head did not hit the ground, Dr. Lakin saw evidence of impact injuries to the victim's back, feet, and skull. She said the victim's head injuries could not have been caused by being tossed into the air. Moreover, some of his injuries would have been painful, so he would not have been playing. Dr. Lakin said that even if the victim's head hit the ground, that did not explain the injuries all over his body. The victim's head and abdominal injuries could have caused vomiting, loss of consciousness, and seizures.

Dr. Lakin testified that the amount of blood in the victim's diaper was not significant and that she did not recall the victim's having any rectal injuries. She explained that as the victim was dying, intestinal sloughing could have occurred, resulting in the discharge of blood into his diaper. The intestinal sloughing would not have been immediate. Dr. Lakin explained that potty training could be a very stressful time for caregivers and that children learning to potty train were subject to high rates of abuse.

On cross-examination, Dr. Lakin testified that she did not speak with the Defendant. Ms. Meeks told Dr. Lakin that Ms. Meeks received a telephone call from the Defendant at

6:18 p.m. on October 10 and that he was "hysterical." Ms. Meeks also told Dr. Lakin that the Defendant claimed he called 911 and attempted CPR.

Dr. Lakin testified that Ms. Meeks described the victim as a "very active" child. Dr. Lakin acknowledged that she reviewed the victim's autopsy report and that the report found no injuries to the victim's liver or spleen. Moreover, Dr. Ali Saad, a neuropathologist, had conducted a neuropathy examination during the victim's autopsy and had not documented any retinal hemorrhages. Dr. Lakin said she disagreed with the results of the autopsy and the neuropathy examination because the abdominal CT scan detected lacerations in the victim's liver and spleen and because the lacerations and retinal hemorrhages were visible in photographs. Dr. Lakin acknowledged that despite a possible injury to the victim's ureter, his kidneys were retrieved for organ donation.

Dr. Lakin acknowledged that she did not know what method of CPR was performed on the victim. She said that in her opinion, the victim's "collection of injuries, which resulted in his death, [was] consistent with abuse, with child abuse or non-accidental trauma." On redirect-examination, Dr. Lakin acknowledged that the medical treatment the victim received at Le Bonheur did not cause his liver and spleen lacerations, his broken ribs, or his skull fracture.

Dr. Peter Horton, a surgeon and expert in multi-organ transplantation, testified that in the early morning hours of October 14, 2018, he removed the victim's ureters and kidneys for transplant into another patient. The victim was on a ventilator because he was "brain dead." Dr. Horton knew "there was a question of abuse" and had been asked "to look out for anything unusual in the abdomen." When he opened the victim's abdomen, bloody fluid was in the abdominal cavity, which was abnormal. Dr. Horton retrieved the victim's kidneys and a portion of the victim's ureters. He did not see an injury in the portion of the right ureter he retrieved, but an injury could have been present in the portion he did not retrieve. The victim's kidneys were successfully transplanted into another patient.

Dr. Horton testified that he saw a hematoma, or collection of blood, around the victim's duodenum and around the mesentery of the small intestine. He said the hematoma was "very, very unusual" because it was deep inside the victim's body and in an area of the body that was difficult to access. The hematoma corresponded to a bruise under the victim's right ribs, and a significant amount of blunt force would have been required to cause the hematoma. Dr. Horton explained that such injuries were most often seen in motor vehicle accidents in which the person was ejected from the vehicle. He opined that the hematoma could have resulted from a kick or a punch but that a bar stool would have been too large to have caused it. CPR or throwing the victim into the air and catching him by his legs also could not have caused the hematoma. The hematoma extended seventy-five

centimeters, which was more than two feet, of the victim's duodenum. The victim would have been in a lot of pain from the injury.

Dr. Horton testified that he also saw a bruise on the underside of the right lobe of the victim's liver and that the bruise was consistent with some type of injury, such as a laceration. Dr. Horton stated that he did not actually see a laceration in the victim's liver during kidney retrieval because he did not remove the liver but that a photograph of the liver appeared to show a small laceration in the right lobe. Dr. Horton said that he saw a laceration to the victim's spleen during kidney retrieval and that minor trauma could cause splenic lacerations. Dr. Horton felt the victim's ribs for fractures, but the victim's ribs felt smooth. He acknowledged that the victim's injuries were significant.

On cross-examination, Dr. Horton testified that the victim's splenic injury was minor compared to the hematoma around the duodenum and mesentery. He stated that a fall from a significant height, such as from a tall tree or an apartment window, or that being hit by a car at twenty miles per hour could cause mesenteric injuries. He said that CPR, performed properly, almost always caused bruising on a patient between the sternum and the skin and that the bruising on the victim suggested CPR had been performed.

Dr. Benjamin Jon Figura, an expert in forensic anthropology, testified that in 2018, he was an in-house consultant for West Tennessee Regional Forensic Center. In October 2018, Dr. William Sago, who had performed the victim's autopsy, requested that Dr. Figura examine the victim's ribs for fractures. Dr. Figura observed remote and recent fractures in the victim's clavicle and ribs. The victim's oldest injury was a fracture in his right clavicle. The fracture was well-healed and could have occurred about six months before his death. The victim had multiple healing fractures in his left ribs. The victim's most recent fractures were in the sixth, seventh, and ninth ribs on his right side. Dr. Figura saw no healing in those fractures, meaning they occurred at or near the time of death. Dr. Figura said that the recent rib fractures were caused by blunt force, such as a punch or a kick, and that he did not think CPR could have caused them due to their location. On cross-examination, Dr. Figura testified that broken ribs began to heal one or two weeks after fracture.

Dr. Marco Ross, an expert in forensic pathology and the Chief Medical Examiner at West Tennessee Regional Forensic Center, testified that Dr. Sago conducted the victim's autopsy on October 15, 2018, prepared a report, and documented the victim's injuries on several body diagrams and in photographs. The State introduced the diagrams and photographs into evidence.

Dr. Ross identified a full body diagram on which Dr. Sago documented the victim's remote and recent blunt force injuries. The diagram showed scrapes, bruises, and lacerations all over the victim's body. Dr. Ross also identified a full body diagram on

which Dr. Sago documented subcutaneous hemorrhages in the victim's arms, legs, back, right buttock, and upper neck. Dr. Ross identified the subcutaneous hemorrhages in photographs. He said that some of the subcutaneous hemorrhages in the victim's extremities were consistent with medical intervention but that the subcutaneous hemorrhages in the victim's back, right buttock, and neck likely resulted from blunt force trauma.

Dr. Ross identified a photograph showing a laceration in the victim's liver. The laceration measured one and one-half centimeters. Dr. Ross said that the laceration, which Dr. Sago did not mention in his original autopsy report but mentioned in an addendum to the report, was consistent with blunt force trauma such as a kick or a punch. Dr. Ross also identified a photograph showing a hemorrhage in the victim's mesentery. He said he agreed with Dr. Horton's opinion that the hemorrhage could not have been caused by the Defendant's throwing the victim into the air and catching the victim. Dr. Ross stated that sloughing of the inner lining of the victim's intestine could have caused rectal bleeding and that such sloughing would not have occurred immediately. He identified a photograph showing hemorrhaging in the victim's chest wall. The hemorrhaging corresponded to the victim's recent rib fractures, and the location of the rib fractures was not consistent with CPR. Dr. Ross said that the victim would have been in "considerable pain" from his injuries and that he would not have been able to engage in normal activities.

Dr. Ross identified a diagram on which Dr. Sago documented blunt force injuries to the victim's head and face. The diagram showed an area of bruising on the victim's forehead, bruises around his eyes, a bruise behind his left ear, a small laceration above his left ear, and abrasions on the back of his head. Dr. Ross said the separate injuries were caused by multiple impacts to the head. He identified photographs of the victim's skull and brain, showing bleeding into the tissues of the scalp on the back of the head; an occipital fracture that extended down the back, left side of the victim's skull; hemorrhages in different areas of the victim's brain; and retinal hemorrhages in the victim's eyes. From the skull fracture and hemorrhages, Dr. Ross identified three impact points on the victim's head: (1) the back, left area; (2) the top, right area; and (3) the left forehead. He said that the Defendant's story of throwing the victim into the air and catching the victim could not have caused all of the victim's injuries and that the victim could have survived the abdominal injuries alone with medical intervention. Dr. Ross concluded that the victim's cause of death was multiple blunt force injuries to the head and that his manner of death was homicide.

On cross-examination, Dr. Ross testified that intestinal sloughing would not occur until hours or days after an injury. Dr. Ross was not present for the victim's autopsy and only saw the victim's organs in photographs. In Dr. Sago's initial autopsy report, he concluded that there were no injuries to the victim's liver or spleen. Dr. Saad, who

conducted a neuropathology of the victim, did not find any retinal hemorrhages in the victim's eyes but found hemorrhages in the victim's optic nerve. Based on Dr. Saad's conclusion, Dr. Ross asked a second neuropathologist to review the victim's photographs for retinal hemorrhages. On redirect examination, Dr. Ross testified that the second neuropathologist found retinal hemorrhages in the victim's eyes.

By agreement of the parties, Dr. Stephen Nelson, the defense's expert in pediatric neurology, was the next witness. Dr. Nelson testified for the Defendant that he reviewed the victim's hospital records and autopsy report and that, in his opinion, the victim's left occipital skull fracture, left subdural hemorrhage, right subarachnoid hemorrhage, and retinal hemorrhages all could have resulted from a single impact to the left side of the victim's head. He explained that "a blow to one part of the head can cause injury in other parts . . . inside the head, because the brain can move around inside the skull. . . . And so it can tear blood vessels that are in the brain or around the brain[.]" Defense counsel asked if the victim's head injuries could have been accidental, and Dr. Nelson responded, "Yes. I mean, all you know is that there was a blunt force injury. . . . How that impact occurred can be from a variety of reasons, one of them is accidental."

On cross-examination, Dr. Nelson testified that although a single blow to the head could explain all of the victim's head injuries, "I wasn't there. All I can say is what could have been the cause." He acknowledged that he did not perform the victim's autopsy but noted that Dr. Ross, who concluded the victim suffered three blows to the head, also did not perform the victim's autopsy. Dr. Nelson stated that he did not review the victim's autopsy photographs because he was giving his opinion as a neurologist, not a pathologist. He said that it was not his job to interpret autopsy photographs and acknowledged that the jury should defer to Dr. Ross's interpretation of the autopsy photographs because Dr. Ross was a forensic pathologist. Dr. Nelson said his fee was $8,000 per day and acknowledged that he was being paid $8,000 for his day of testimony.

Dr. Nelson acknowledged that the victim's autopsy report included evidence of blunt force injuries to other parts of the victim's body and that the victim's extensive injuries showed he had been abused. Dr. Nelson also acknowledged that the Defendant claimed the victim's head did not hit the ground. Dr. Nelson said that if the Defendant was mistaken and the victim's head hit the ground, then that impact could explain the victim's head injuries. Dr. Nelson acknowledged that the victim's recent injuries occurred while the victim was in the sole care of the Defendant. However, he noted that the victim had "older" injuries and that it was not known who was caring for the victim when the victim sustained those injuries.

Dr. Nelson acknowledged that if the victim was uninjured when his mother dropped him off at daycare, then the victim's abdominal injuries must have occurred at the same

time as his head injuries. He said that CPR, performed properly, could not cause a mesenteric hematoma but that CPR, performed improperly, could cause abdominal injuries and rib fractures, especially when performed improperly for an extended period of time. Dr. Nelson acknowledged that medical personnel would not have performed CPR improperly on the victim. He noted that the Defendant claimed to have performed CPR before emergency personnel arrived and that it was not known if the Defendant performed the CPR properly. Dr. Nelson stated, "I think at least some of the injuries could have been from CPR, but I would agree that it's hard to explain all of them."

Dr. Nelson testified that a person's skull was "relatively difficult to fracture" but that a kick could cause a skull fracture. He said that the victim's head injuries caused the victim's death but that he could not say whether the head injuries were accidental. The State asked Dr. Nelson about the blood in the victim's diaper, and he said he did not know blood was in the diaper. He said that he intended to give an opinion only on the victim's head injuries but that the prosecutor was asking him about other injuries. He acknowledged that potty training was stressful for caregivers and that potty training could lead to abuse.

On recross-examination, Dr. Nelson acknowledged that the defense only asked him to review medical reports related to the victim's nervous system. The defense did not ask him to investigate the case.

After Dr. Nelson's testimony, the State resumed its case-in-chief by calling Sergeant Mary Bibbs, an officer with the MPD and the lead investigator in the case, to the stand. Sergeant Bibbs testified that on October 10, 2018, she was a member of the MPD's Child Advocacy Center Investigation Team and was dispatched to Le Bonheur. When she arrived, she learned the victim was critically injured with a skull fracture and bleeding in his brain. She spoke with the victim's mother, and the victim's mother made "a horrible cry" when informed that the victim was in extremely critical condition.

Sergeant Bibbs testified that she and another officer, Sergeant Dobbins, later met with the Defendant in an interview room at the MPD on North Main Street. The Defendant signed an Advice of Rights form at 1:03 a.m. on October 11 and gave an audio-recorded interview.

The State played the recording for Sergeant Bibbs in the presence of the jury, and we have listened to the recording. During the Defendant's interview, he stated as follows: The Defendant picked up the victim from daycare about 4:15 p.m. and drove the victim to the Defendant's home on Kings Arms Street. When they arrived, the Defendant smelled that the victim had a dirty diaper, so the Defendant drove to Walgreens with the victim to buy baby wipes. The Defendant bought the wipes and drove back to his house. He changed the victim's diaper in the car. The Defendant wanted the victim to play outside before they

went into the house so that the victim would get tired.  The victim ran around the car and ran into the yard, and the Defendant began playing with the victim in the backyard.  The Defendant stated:

> He would come to me, he would flip, and then he would run off, he would come back, I would throw him up, and I'd catch him.  We were just playing.  So I threw him up, and I missed him, but I grabbed his leg and snatched him up.  All I was able to catch was his leg.  I caught his leg, snatched him up and swung him around because I didn't want him to hit the ground.  And when I did, his neck went back like this, and he stopped.  So, I panicked.  I immediately snatched him and ran into the house.  We were outside.  I ran into the house.  I called 911.  The operator was telling me, look, give him chest compressions.  She was trying to tell me how to give them and telling me how to give him mouth-to-mouth, cover his nose and breathe.  And this is all I'm doing the entire time.  Because, I mean, we were just playing.  And it was not like it was something that was abnormal.  He never touched the ground. He didn't hit the ground.  I didn't drop him.  I caught him, and when I caught him, I caught him by his leg.  I'm not sure if it was his right or left leg.  I caught him.

The Defendant said that as he was trying to get his house keys out of his pocket, he dropped his car keys on the ground and left them there.  While the victim was lying on the floor in the den, the Defendant's thirteen-year-old daughter came downstairs and asked what was wrong with the victim.  The Defendant told the officers that he loved the victim like his own son and that he would never hurt "this little boy."  The Defendant stated that he had a three-year-old son, who did not live with him, and that he would not harm a child.

The Defendant could be heard on the recording demonstrating how he was playing with the victim and how he caught the victim by the victim's leg.  After the demonstration, Sergeant Bibbs asked how the Defendant's car keys ended up in the shed, and he said he did not know because he and the victim did not go into the shed.  The Defendant then suddenly remembered that he put the wipes he had bought at Walgreens into the shed.  However, he maintained that his car keys fell onto the ground as he was taking the victim into the house.  The Defendant said he put a pull-up diaper on the victim when he changed the victim's diaper in the car and that he put the victim's dirty diaper into an outside trash can.  Sergeant Dobbins told the Defendant that she saw a dirty diaper in an outside trash can.  The Defendant said a dirty pull-up diaper could not have been in the bathroom of his house.

During the interview, Sergeant Bibbs told the Defendant that the victim had a skull fracture and was "fighting for his life."  The Defendant maintained that the victim's head

did not hit the ground. He said that the victim's head "snapped back" when he caught the victim and that he panicked because he thought the victim's neck was broken. The Defendant said that the victim vomited into the Defendant's mouth while the Defendant was administering mouth-to-mouth resuscitation and that the Defendant became physically ill and vomited in the bathroom after the police arrived.

The State questioned Sergeant Bibbs about the Defendant's interview. She testified that he demonstrated how he was playing with the victim. During the demonstration, the Defendant squatted down and showed how the victim ran into his arms. The Defendant then showed how he stood up and threw the victim into the air. He also showed how the victim was flipping over. The State asked about the Defendant's demeanor during the interview, and Sergeant Bibbs said he was "really excited" and "[j]ust constantly talking, answering things that we didn't ask." Sergeant Bibbs thought it was "odd" that the Defendant kept referring to the victim as the "little boy" because the Defendant said the victim was like a son to him. She said that after the interview, she telephoned "the DA on-call to see how we needed to proceed" and that the Defendant "was taken into custody and transported at that point."

On cross-examination, Sergeant Bibbs testified that prior to the Defendant's interview, a police officer transported him to the police department in the back of a patrol car. The Defendant was handcuffed during transport. The Defendant told Sergeant Bibbs that he did not know how high he threw the victim but acknowledged that he appeared to throw the victim "'to the sky.'" He said that the victim "'liked it'" and that the victim was also "flipping and running." The Defendant said that the last time he threw the victim into the air, he grabbed the victim's leg. Sergeant Bibbs asked him if the victim's head could have hit the ground. The Defendant said no but that the victim's head "'went back'" and that the victim was limp. The Defendant stated that the victim was not breathing when he telephoned 911 but that he could feel the victim's heart beating. Sergeant Bibbs acknowledged that the Defendant asked her for an update on the victim's condition and that the Defendant sometimes referred to the victim by the victim's first name.

On redirect-examination, Sergeant Bibbs acknowledged that the Defendant's demonstration did not make a lot of sense. She said, "[T]hat's why we were asking him to explain what was happening at each point from the squat to the forceful throw." She said that the Defendant ultimately admitted that his car keys were in the shed but that he never gave an explanation for the victim's red shoe being in the shed or the victim's pull-up diaper being in the bathroom.

James Byars, an investigator with the Shelby County District Attorney General's Office, testified that he was asked to perform an experiment by driving from First Step Learning Academy to the Defendant's house on Kings Arms Street, then driving from the

Defendant's house to Walgreens, and then driving from Walgreens back to the Defendant's house. Investigator Byars did not know which Walgreens the Defendant had visited on October 10, 2018, so he chose the store closest to the Defendant's house, which was the Walgreens at the intersection of Knight Arnold and Hickory Hill. He performed the experiment at 4:10 on Wednesday, August 24, 2022, which was the same day of the week and approximately the same time of day that the Defendant drove with the victim. Investigator Byars took the fastest route provided by his cellular telephone and obeyed the speed limit and traffic laws. The total drive time was fifteen minutes.

Danielle Porter testified that she and Ms. Meeks were best friends and that she helped Ms. Meeks take care of the victim when the victim was born. She described the victim as "sweet and loving, very smart." The victim liked to run and play but was cautious and did not like to be thrown into the air. Mrs. Porter said that her husband was the adult in the video in which the victim was walking up the adult's legs and was flipping over. The victim was excited to see his parents and Mrs. Porter but was "very cautious" around the Defendant. On October 10, 2018, Mrs. Porter drove Ms. Meeks to Le Bonheur. Mrs. Porter described Ms. Meeks as "hysterical."

The State recalled Dr. Lakin to the stand. Dr. Lakin testified that intestinal sloughing could occur due to trauma to the abdomen and the resulting lack of oxygen to the intestinal tract. The sloughing of blood cells from the intestine occurred as the person was dying and would not begin immediately but would begin ten to fifteen minutes after the trauma. The State asked if the amount of blood in the victim's pull-up diaper was consistent with intestinal sloughing, and Dr. Lakin responded yes because she did not know of any other explanation for the blood.

Dr. Lakin testified that the victim was in shock and hypothermic when he arrived at Le Bonheur. She acknowledged that it would "take a little time" for a patient to become hypothermic. Dr. Lakin disagreed with Dr. Nelson's opinion that CPR, performed improperly on the victim's abdomen, could have caused the victim's abdominal injuries. She explained, "So his injuries were specific to the duodenum. And as you heard previously, it is very difficult to get to the duodenum because it's very deep and towards the back." For the same reason, Dr. Lakin did not think CPR could have caused the laceration on the underside of the victim's liver.

The State asked Dr. Lakin about Dr. Nelson's opinion that one blow to the head could explain all of the victim's head injuries. She said she did not agree with that opinion "at all" because a toddler's brain could not move around in the skull as much as an infant's brain. Moreover, the victim had three separate bleeds: a bleed from the skull fracture, a subdural bleed, and a subarachnoid bleed. Dr. Lakin said that it did not make sense that a bleed in one area of the brain could explain a bleed in another area. She said that, in her

opinion, the victim suffered three blows to the head. On cross-examination, Dr. Lakin acknowledged that she was not a neurologist or a neuropathologist.

At the conclusion of Dr. Lakin's testimony, the State rested its case. The Defendant introduced a redacted version of his 911 call into evidence and played the call for the jury. During the call, the emergency operator told the Defendant how to perform CPR on the victim. She told the Defendant to place the heel of his hand on the victim's breastbone in the center of the chest, right between the nipples. She told him to push down about two inches with the heel of his hand, to "pump the chest hard and fast thirty times, at least twice per second," and to let the chest "come all the way up between pumps."

The Defendant did not present any additional evidence and rested his case. The jury convicted him as charged in the indictment of two counts of first degree felony murder, one count of aggravated child abuse, and one count of aggravated child neglect. The trial court immediately sentenced him to life for the first degree felony murder convictions and merged the convictions. The trial court ordered a presentence report and scheduled a sentencing hearing for the remaining convictions.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant claims that the evidence is insufficient to support his convictions. The State argues that the evidence is sufficient. We conclude that the evidence is sufficient to support the convictions of first degree felony murder in the perpetration of aggravated child abuse, aggravated child abuse, and aggravated child neglect but that the evidence is insufficient to support the conviction of first degree felony murder in the perpetration of aggravated child neglect.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-91 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the

weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

Relevant to this case, first degree felony murder is the "killing of another committed in the perpetration of . . . any . . . aggravated child abuse . . . [or] aggravated child neglect[.]" Tenn. Code Ann. § 39-13-202(a)(2). No culpable mental state is required for first degree felony murder except the intent to commit the enumerated offense. *Id*. at § 39-13-202(b).

A person commits the offenses of aggravated child abuse and aggravated child neglect who commits child abuse, as defined in Tennessee Code Annotated section 39-15-401(a), or child neglect, as defined in Tennessee Code Annotated section 39-15-401(b), and the act of abuse or neglect results in serious bodily injury to the child. *Id*. at § 39-15-402(a)(1). Child abuse occurs when "[a]ny person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury[.]" *Id*. at § 39-15-401(a). Child neglect occurs when "[a]ny person who knowingly . . . neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare[.]" *Id*. at § 39-15-401(b). A person acts "knowingly . . . with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." *Id*. at § 39-11-106(a)(20) (2018).

"Bodily injury" is defined as "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." *Id*. at § 39-11-106(a)(2) (2018). The statute for aggravated child abuse and neglect provides that "serious bodily injury to the child"

> includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects.

*Id.* at § 39-15-402(c) (2018). Aggravated child abuse and aggravated child neglect of a child eight years old or less are Class A felonies. *Id.* at § 39-15-402(b).

Regarding the Defendant's conviction of first degree felony murder committed in the perpetration of aggravated child abuse and his conviction of aggravated child abuse, the Defendant acknowledges that the victim suffered serious bodily injury. However, he contends that the State failed to show the injuries were caused by anything other than a horrible accident in which the victim's head must have hit the ground while he was playing with the victim. He further contends that the CPR he administered must have caused the victim's abdominal injuries and that, aside from "some conjecture" about his being frustrated with the victim's potty training, the State did not present any evidence to suggest why he would have harmed the victim.

Taken in the light most favorable to the State, we have no hesitation in concluding that the evidence is sufficient to support the convictions. The proof shows that the two-year-old victim was uninjured when his mother dropped him off at daycare on the morning of October 10 and when the Defendant picked him up at 4:10 p.m. From 4:10 p.m. to 6:00 p.m., the victim was in the sole care of the Defendant. During that time, the victim sustained multiple, catastrophic injuries to his head. Specifically, he suffered a skull fracture on the back of his head, a subdural hemorrhage on the left side of his head, and a subarachnoid hemorrhage on the right side of his head. Dr. Ross and Dr. Lakin agreed that the victim received three blunt force impacts to the head, and Dr. Ross concluded that those impacts caused the victim's death. The victim also suffered blunt force injuries to his abdomen that broke three ribs on his right side, caused bleeding around his duodenum and mesentery, and caused a laceration on the underside of his liver. Dr. Horton testified, and Dr. Lakin agreed, that significant force was needed to cause the injury to the victim's duodenum and mesentery because the injury was deep inside the victim's body. All three doctors testified that the Defendant's claim of throwing the victim into the air and catching him by his leg did not explain his extensive injuries and that CPR could not have caused his broken ribs or the hematoma in his abdomen. The Defendant's own expert, Dr. Nelson, testified that the victim's extensive injuries showed he had been abused and that CPR, even performed improperly, could not explain all of his injuries. Therefore, we conclude that the evidence overwhelmingly supports the Defendant's convictions of first degree felony murder committed in the perpetration of aggravated child abuse and aggravated child abuse.

Regarding the Defendant's conviction of first degree felony murder committed in the perpetration of aggravated child neglect and his conviction of aggravated child neglect, the Defendant contends that the State failed to show he neglected the victim's health. We disagree. Again, we take the evidence in the light most favorable to the State. The evidence

shows that the Defendant picked up the victim from daycare at 4:10 p.m., drove home, drove to Walgreens to buy baby wipes, bought the baby wipes, and drove back home. Mr. Byars discovered that the drive took about fifteen minutes, not including the time it took to buy the wipes. During closing arguments, the State asserted that taking into consideration the amount of time it took to buy the wipes, the Defendant would have arrived home about 4:35 p.m. The Defendant said in his police interview that he changed the victim's diaper in the car, that he began playing with the victim, and that the victim's injuries occurred soon after. However, the Defendant did not call 911 until more than one hour later. Mr. Lovett testified that when the firemen arrived at the scene, the Defendant was not outside with the victim, which was unusual, and that they had to enter the back of the home. The victim was lying alone on the floor of a dark room. He was not breathing and did not have a pulse.

In order to sustain a conviction of child neglect, the proof must establish that the neglect had "an actual, deleterious effect upon the child's health and welfare." *State v. Mateyko*, 53 S.W.3d 666, 669 (Tenn. 2001). In addition, when a defendant is convicted of both aggravated child abuse and aggravated child neglect, "this court has held that there must exist some evidence that the alleged act of neglect resulted in serious bodily injury in addition to and apart from the serious bodily injury caused by the initial act of abuse." *State v. Clark*, No. M2023-01427-CCA-R3-CD, 2025 WL 2985293, at *36 (Tenn. Crim. App. Oct. 23, 2025) (citing cases collected in *State v. Watkins*, No. M2009-02607-CCA-R3-CD, 2011 WL 2682173, at *24 (Tenn. Crim. App. July 8, 2011)), *perm. app. filed* (Tenn. Dec. 22, 2025).

Dr. Lakin testified that the victim's temperature was just eighty-eight degrees by the time he arrived at Le Bonheur, indicating hypothermia, and that she thought the small amount of blood in his diaper was caused by intestinal sloughing. She said that hypothermia "took a little time" to develop and that intestinal sloughing occurred during dying but not immediately. Dr. Ross also opined that the victim experienced intestinal sloughing and said that intestinal sloughing took hours or days to develop. Therefore, we conclude that a rational jury could have found that the Defendant delayed seeking medical help for the victim and that the delay resulted in hypothermia and intestinal sloughing in addition to and apart from the head and abdominal injuries caused by the initial act of abuse. However, Dr. Ross testified that the victim died from his head injuries, and the State did not present any evidence that the delay in seeking medical care or the resulting hypothermia or intestinal sloughing had any effect on his death. Accordingly, we conclude that the evidence is sufficient to support the Defendant's conviction of aggravated child neglect but insufficient to support his conviction of first degree felony murder in the perpetration of aggravated child neglect. We note that our reversal of the conviction, which the trial court merged with the conviction of first degree felony murder in the perpetration

of aggravated child abuse, does not affect the Defendant's total effective sentence of life plus fifty years.

## II. Double Jeopardy

The Defendant claims that the trial court's ending his first trial and discharging the jury after jeopardy attached, without declaring a mistrial or the existence of manifest necessity, operated as an acquittal such that his second trial violated double jeopardy. The State argues that the Defendant is not entitled to relief because the trial court effectively granted a mistrial, which the Defendant requested. We agree with the State.

The Defendant initially went to trial with a sequestered jury in September 2022. On the morning of September 20, the third day of testimony, defense counsel filed a written motion for a mistrial and requested to discuss the motion in-chambers with the trial court. One of the reasons listed in the motion for a mistrial was that defense counsel may have violated the discovery rule, which would affect the ability of the Defendant's expert witness to testify. The trial court held an in-chambers meeting during which the trial court told defense counsel that "you're actually asking for a continuance." After the in-chambers meeting, defense counsel amended the motion for a mistrial to a motion for a continuance, and the trial court requested that defense counsel state on the record the reason for requesting the continuance. Defense counsel explained that she failed to notify the State that Dr. Nelson was going to testify about Dr. Saad's neuropathology report and that, as a result, the State was objecting to Dr. Nelson's testimony. Defense counsel stated that she reviewed Tennessee Rule of Criminal Procedure 16 but did not think she was required to notify the State about Dr. Nelson's testimony because Dr. Nelson did not prepare his own report. Defense counsel advised the trial court that many experts were going to testify for the State and that defense counsel could not provide the Defendant with an adequate defense if the trial court excluded Dr. Nelson's testimony. The State confirmed that it was objecting to Dr. Nelson's testifying about Dr. Saad's report without prior notice but stated that it was "absolutely opposed to any continuance."

The trial court ruled that given defense counsel's possible violation of the reciprocal discovery obligations under Tennessee Rule of Criminal Procedure 16,[3] the trial court was granting the Defendant's motion for a continuance. The trial stated,

---

[3] Tennessee Rule of Criminal Procedure 16(b)(1)(B) generally provides that if the defendant requests disclosure of reports of physical or mental examinations from the State, and the State complies, then the defense must disclose to the State, on request, reports of physical or mental examinations if the item is within the defendant's possession, custody, or control and the defendant intends to introduce the item into evidence in the defendant's case-in-chief or the defendant intends to call the person who prepared the report as a witness at trial and the report relates to the witness's testimony. Tenn. R. Crim. P. 16(b)(1)(B)(i)-(iii).

If I denied the request for a continuance and [the Defendant] proceeds to trial and he's convicted, part of the motion for new trial hearing -- and the Court could consider that in a motion for new trial and also part of the appeal -- would be that [the Defendant] was not provided a fair trial because he was denied the opportunity to have an expert called as a witness.

. . . .

And, again, had Dr. Nelson been called, without the State having been given that information [that formed the basis of his opinion], we would have a jury-out hearing under [Tennessee Rule of Evidence] 102 and make a decision as to whether or not that doctor, in fact, should testify. And in all likelihood, this Court would have determined that that doctor would not testify. And then it creates a situation as to whether or not [the Defendant] has been prejudiced if this Court does not grant this request for a continuance.

. . . .

It is not in the best interest of justice to continue this case, to deny [the Defendant's] right to have an expert called and have these issues raised in a motion for new trial where if that expert had been called it might have made a difference in the result, to have it raised on appeal and ultimately have it raised on post-conviction as to whether or not [defense counsel] should have had an expert available and had an expert qualified and had an expert present testimony that might rebut some of the State's proof.

It would not be in the best interest of justice to put [the Defendant] through two separate trials. It would not be in the best interest of justice to put [the victim] and his family through two separate trials.

. . . .

So within the exercise of the Court's discretion, I'm going to grant this request for a continuance. Will conclude this trial today. Will discharge the jury on this case. Will grant a continuance on this case. Will set this case for a report setting. Allow the State of Tennessee to be given the discovery, which they should have already received.

When the jury returned to the courtroom, the trial court told the jurors, "We're not going to continue the trial for some legal reasons." The trial court then stated,

Some legal things have come up in this trial that makes continuation of this trial impossible. So I'm going to grant a continuance on this case. We will get another trial date on this case somewhere in the future. It will be tried by a different jury at a different date.

The trial court reiterated that "I can't allow the case to continue for trial" and discharged the jury. The Defendant's second trial, with a different sequestered jury, began more than fifteen months later on January 8, 2024.

The double jeopardy clauses of the United States and Tennessee constitutions protect an accused from: "'(1) a second prosecution following an acquittal; (2) a second prosecution following a conviction; and (3) multiple punishments for the same offense.'" *State v. Allison*, 618 S.W.3d 24, 43 (Tenn. 2021) (quoting *State v. Watkins*, 362 S.W.3d 530, 541 (Tenn. 2012)). Jeopardy attaches in a jury trial when the jury is impaneled and sworn. *State v. Knight*, 616 S.W.2d 593, 595 (Tenn. 1981). Moreover, jeopardy continues "'where criminal proceedings against an accused have not run their full course.'" *Justices of Boston Mun. Ct. v. Lydon*, 466 U.S. 294, 308 (1984) (quoting *Price v. Georgia*, 398 U.S. 323, 329 (1970)). Double jeopardy does not prohibit a retrial, though, "where there is a 'manifest necessity' for the declaration of the mistrial, regardless of the defendant's consent or objection." *State v. Mounce*, 859 S.W.2d 319, 321 (Tenn. 1993). In other words, a mistrial is an appropriate remedy when a trial cannot continue or a miscarriage of justice would result if it did. *State v. McPherson*, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994).

Double jeopardy also does not bar a retrial when the defendant requests a mistrial. *State v. Huskey*, 66 S.W.3d 905, 916 (Tenn. Crim. App. 2001). As our supreme court has stated, a defendant cannot rely on the principles of double jeopardy "'where the Government was quite willing to continue with its production of evidence to show the defendant guilty before the jury first impaneled to try him, but the defendant elected to seek termination of the trial on grounds unrelated to guilt or innocence.'" *Knight*, 616 S.W.2d at 597 (quoting *United States v. Scott*, 437 U.S. 82, 96 (1978)). "In such a case the accused has deliberately elected to forego his right to have guilt or innocence determined by the first trier of fact." *Id.* at 596. Additionally, when a trial court grants a mistrial at a defendant's request, the defendant cannot claim that the trial court lacked the manifest necessity required for the mistrial. *State v. Leath*, 461 S.W.3d 73, 96 (Tenn. Crim. App. 2013). The decision to grant a mistrial lies within the sound discretion of the trial court, and this court will not interfere with the exercise of that discretion absent clear abuse appearing on the face of the record. *See State v. Hall*, 976 S.W.2d 121, 147 (Tenn. 1998).

Turning to the instant case, the Defendant anticipated that the trial court was going to prohibit Dr. Nelson from testifying pursuant to Tennessee Rule of Criminal Procedure

and sought to terminate his trial on grounds unrelated to his guilt or innocence. Therefore, the Defendant requested a mistrial, not a continuance. The trial court advised the parties that the court was terminating the trial, was discharging the jury, and would set the case for a report setting so that the State could receive the discovery materials to which the State was entitled. Moreover, when the jurors entered the courtroom, the trial court told them three times that the trial could not continue for legal reasons, stated that the trial court would conduct a new trial at a later date with a different jury, and discharged the jury. Thus, we agree with the State that the trial court granted a mistrial, not a continuance. *See McPherson*, 882 S.W.2d at 370 (stating that "[a] motion for the entry of a mistrial is a procedural device which requests the trial court to stop the trial, discharge the jury, and impanel another jury to determine the guilt of the accused"). Given that the Defendant requested the mistrial, he cannot now claim that his second trial violated double jeopardy. He also cannot claim that the trial court erred by not finding the existence of manifest necessity, although the trial court's comments demonstrate that it did find the existence of manifest necessity. We note that at oral arguments, counsel for the Defendant conceded that the Defendant requested to terminate his first trial and that the trial court's error in referring to the termination as a "continuance" was harmless because the trial court granted the Defendant's request and ended the trial. Thus, the Defendant is not entitled to relief on this issue.

### III. Motion to Suppress

The Defendant claims that the trial court erred by denying his motion to suppress his statement to police because he unequivocally invoked his right to counsel and because his waiver of his *Miranda* rights was rendered involuntary by police trickery. The State argues that the trial court properly denied the motion. We agree with the State.

Before the Defendant's first trial, he filed a motion to suppress his statement to Sergeant Bibbs and Sergeant Dobbins, claiming that the officers continued to question him after he unambiguously invoked his right to counsel and that Sergeant Bibbs deceived him into giving a statement by saying he had been "detained" when he had been arrested. The trial court held a suppression hearing on June 29, 2020. Sergeant Bibbs testified at the hearing, and the parties introduced into evidence a Record of Arrest form, showing that MPD officers arrested the Defendant at 12:01 a.m. on October 11 and transported him from Kings Arms Street to the MPD on North Main Street for "further investigation." The parties also introduced into evidence the Defendant's Advice of Rights form, which showed that his interview began at 1:03 a.m. and that he waived his rights at 1:07 a.m., and introduced the audio recording of his interview.[4]

---

[4] We note that a transcript of the suppression hearing, containing Sergeant Bibbs's testimony, is not in the appellate record. Tennessee Rule of Appellate Procedure 27(b) provides that it is a defendant's

We have reviewed the audio recording of the interview. At the outset of the interview, Sergeant Bibbs asked the Defendant for his personal information, including his date of birth and social security number.[5] The forty-year-old Defendant told her that he had "some college," that he was not under the influence of drugs or alcohol, and that he had not been diagnosed with any mental illness or disease. Sergeant Bibbs advised him that before she asked him any questions, she was going to read him his rights. The Defendant asked, "Am I being arrested?" Sergeant Bibbs responded, "Being detained. Uh, we're gonna ask you some questions." The Defendant told her that he thought he was "just being interviewed." Sergeant Bibbs told him, "That's what we're doing, but I still have to advise you of your rights." She then proceeded to read an Advice of Rights form aloud to the Defendant, which included his right to remain silent, his right to talk to a lawyer before the interview, his right to have a lawyer present during the interview, and his right to have a lawyer appointed if he could not afford one. When she finished reading the form, she asked if he understood his rights, and he said yes.

Sergeant Bibbs asked the Defendant to initial each of his rights, to read his waiver aloud, and to sign the form. He did so, and Sergeant Bibbs asked if he was ready to give a statement. He responded, "Should I, okay, I don't have a problem giving you a statement because it was an accident. But do I need a lawyer? I don't know, should I have a lawyer here?" Sergeant Bibbs told him, "It's your choice because it's your right. We can't tell you either way." The Defendant stated, "I don't know, if I'm arrested, should I have a, 'cause I don't know. He just told me I was coming to give a statement. I, I don't have a problem giving my statement 'cause it's not --." Sergeant Bibbs asked, "So you wish to give us a statement?" The Defendant said, "I'll give you a statement because it was an accident. I would never hurt that little boy, man. Never." The Defendant asked for an update on the victim's condition, and Sergeant Bibbs's said someone was checking on the victim. Later in the interview, Sergeant Bibbs informed the Defendant that the victim had a skull fracture and was fighting for his life.

About one and one-half hours into the interview, the Defendant said that he did not know what more to tell them, that the victim's head never hit anything, and that he did not do anything to the victim that would have caused a skull fracture. The Defendant asked, "Do I need to get a lawyer? That's my question." Sergeant Bibbs responded, "That's your choice. That was the point of us advising you of your rights. That's a decision only you can make." The Defendant stated, "Look, I told you guys what the police officer told me

---

duty to prepare a record which conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Without the transcript, we could consider the issue waived. However, the trial court's order denying the motion to suppress relied mainly on the exhibits introduced into evidence at the hearing. Therefore, we have an adequate record to review the issue.

[5] The parties provided the trial court with a transcript of the interview. We have summarized the interview from our hearing of the recording, not the transcript.

when he was bringing me here. He said, 'Look, you're not under arrest. We just want to get your statement.'" One of the officers said something unintelligible, and the Defendant responded, "Huh? He didn't say that? He didn't say that? I asked him, I said, 'Am I under arrest?' And I ask you guys too. If I am under arrest, then I would like to have a lawyer." One of the officers said again that "it's up to you." The Defendant kept asking if he was under arrest and said, if so, he wanted a lawyer. Sergeant Bibbs asked if the Defendant wanted to say anything else about the victim. The Defendant asked one last time if he was under arrest before Sergeant Bibbs stopped the interview.

On August 21, 2020, the trial court entered a written order denying the motion to suppress. In the order, the trial court noted that one of the issues at the suppression hearing was whether the Defendant was under arrest or just detained at the time of his interview. The trial court stated that for sake of argument, the court was going to assume the Defendant was in custody and, therefore, was subject to "custodial interrogation." The trial court found that the Defendant initialed his rights on an Advice of Rights form and signed the form before his interview. The trial court quoted extensively from the interview and concluded that the Defendant's asking at the beginning of the interview if he needed a lawyer and if he should have a lawyer present were not unequivocal statements for an attorney. The trial court found no merit to the Defendant's claim that Sergeant Bibbs's telling him that he was being detained rather than arrested rendered his statement unknowing, unintelligent, and involuntary. The trial court noted that uniformed police officers transported the Defendant from Kings Arms Street to the police department, that Sergeant Bibbs read an Advice of Rights form to him, that he initialed and signed the form, that he had some college education, that he was not under the influence of alcohol or drugs and did not have a mental illness, that he waived his rights in the first four minutes of his interview, and that the tone of Sergeant Bibbs's voice during the interview was "relatively soft and calm, not lout, abusive, or combative." The trial court concluded that even if Sergeant Bibbs's telling the Defendant that he was being detained could be considered trickery or deception, it was not the type of coercion that rendered the Defendant's *Miranda* waiver involuntary.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Accordingly, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Odom*, 928 S.W.2d at 23. We note that

- 26 -

"in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

The Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution generally provide to individuals accused of criminal activity a privilege against self-incrimination. In *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." These procedural safeguards require that police officers must advise a defendant of his or her right to remain silent and of his or her right to counsel before they may initiate custodial interrogation. *State v. Sawyer*, 156 S.W.3d 531, 533 (Tenn. 2005). A *Miranda* waiver "must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *State v. Climer*, 400 S.W.3d 537, 564 (Tenn. 2013) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). The waiver also "must be 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Id.* (quoting *Moran*, 475 U.S. at 421). Courts analyze a *Miranda* waiver under the totality of the circumstances. *Id.*

The right to counsel applies "whenever a suspect requests that counsel be present during police-initiated custodial interrogation." *State v. Saylor*, 117 S.W.3d 239, 244 (Tenn. 2003). "Custodial" means that the subject of questioning is in "custody or otherwise deprived of his freedom by the authorities in any significant way." *Miranda*, 384 U.S. at 478. Upon a suspect's unequivocal request for an attorney, police must cease all interrogation unless the suspect initiates further communication. *See Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994).

"[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," then the officer does not have to stop questioning the suspect or clarify whether the suspect wants to invoke the right to counsel. *Davis v. United States*, 512 U.S. 452, 459 (1994). Moreover, "[q]uestions that merely probe the parameters of *Miranda* rights are properly characterized as 'equivocal statements made by a person who is still in the decision making process.'" *Climer*, 400 S.W.3d at 563 (citing *Saylor*, 117 S.W.3d at 246). For example, a defendant's stating, "Maybe I should talk to a lawyer," or asking, "Don't I need to talk to a lawyer?" have been deemed equivocal requests for counsel. *Davis*, 512 U.S. at 462; *State v. Ledford*, No. E1999-00917-CCA-R3-CD, 2000 WL 1211312, at *9 (Tenn. Crim. App. Aug. 28, 2000), *no perm. app. filed*. "Whether an individual's request for counsel is equivocal or unequivocal is a mixed

question of law and fact that is ultimately subject to de novo review." *Climer*, 400 S.W.3d at 556.

Here, Sergeant Bibbs gave *Miranda* warnings to the Defendant, and the Defendant said he understood his rights. Sergeant Bibbs asked if the Defendant was ready to give a statement, and the Defendant responded by asking if he needed a lawyer and if he should have a lawyer during the interview. Sergeant Bibbs told him that it was his right to have a lawyer present. The Defendant debated about having a lawyer and then said he did not have a problem giving his statement because "it was an accident." The Defendant's requests for counsel were equivocal, so the officers did not have to stop the interview.

As to whether Sergeant Bibbs tricked the Defendant into giving his statement by telling him that he was detained rather than arrested, in order for a statement to be admissible, it must be "'free and voluntary; that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.'" *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). "[T]he essential inquiry under the voluntariness test is whether a suspect's will was overborne so as to render the confession a product of coercion." *Climer*, 400 S.W.3d at 568 (citing *Dickerson v. United States*, 530 U.S. 428, 433-35 (2000); *Smith*, 933 S.W.2d at 455).

In determining whether a statement was voluntary, this court examines the totality of the circumstances surrounding the statement, including "'both the characteristics of the accused and the details of the interrogation.'" *Id*. (quoting *Dickerson*, 530 U.S. at 434). Factors relevant to the inquiry include:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep[,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*Id*. (quoting *State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996)). "A defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense." *Smith*, 933 S.W.2d at 455. "In order to be considered voluntary, the statement must not be extracted by 'any sort of threats or violence, nor obtained by any

direct or implied promises, however slight, nor by the exertion of any improper influence.'" *State v. Smith*, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting *Bram*, 168 U.S. at 542-43)).

The forty-year-old Defendant, who had some college education, had just been transported to the police department in a police car by uniformed officers. Moreover, it was revealed at trial that he had been handcuffed during transport. When the Defendant asked Sergeant Bibbs if he was being arrested, she did not tell him no. Instead, she told him that he was being "detained." She then proceeded to read his *Miranda* rights, which included his right to remain silent and his rights to counsel before and during his interview. The Defendant said he understood his rights, initialed each of his rights, and signed his waiver of rights form just four minutes into his interview. Sergeant Bibbs asked if he was ready to give a statement, and the Defendant made several equivocal requests for counsel. Sergeant Bibbs told the Defendant that having a lawyer was his choice and his right. The Defendant indicated that he did not know whether he should ask for a lawyer because he did not know if he was under arrest but then immediately stated, "I don't have a problem giving my statement. I'll give a statement because it was an accident." After speaking with the officers for one and one-half hours, the Defendant again made equivocal statements about a lawyer. Sergeant Bibbs stated, as she had at the beginning of the interview, that it was his choice and his right to have counsel. The Defendant asked if he was under arrest because, if so, he wanted an attorney, and Sergeant Bibbs ended the interview. We conclude that the Defendant voluntarily gave his statement and that the trial court properly denied the motion to suppress.

## IV. Autopsy Report

The Defendant claims that the trial court's allowing Dr. Ross to testify about the victim's autopsy report when Dr. Ross did not prepare the report violated the Confrontation Clause under the United States Supreme Court's recent guidance in *Smith v. Arizona*, 602 U.S. 779 (2024), and constitutes plain error. The State argues that the trial court did not commit plain error. We agree with the State.

Initially, the Defendant did not object at trial to Dr. Ross's testifying about the autopsy report prepared by Dr. Sago. *See* Tenn. Rule of Evid. 103(a). He also did not raise the issue in his motion for new trial or at the hearing on the motion. *See* Tenn. R. App. P. 3(e). Nevertheless, we may review the issue for plain error. Tenn. R. App. P. 36(b); *see State v. Knowles*, 470 S.W.3d 416, 423 (Tenn. 2015).

We may consider an issue to be plain error when all five of the following factors are met:

(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); *see also State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the *Adkisson* test for determining plain error). Additionally, the "'plain error' must be of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)).

First, we cannot conclude that a clear and unequivocal rule of law was breached or that a substantial right of the accused was adversely affected. In Tennessee, criminal defendants are entitled to confront witnesses against them under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. "Currently, *Crawford v. Washington*, 541 U.S. 36 (2004), and its progeny are the controlling authority for determining whether the admission of hearsay violates a defendant's rights under the federal confrontation clause, and [our supreme court] has applied *Crawford* to challenges under the Tennessee Constitution, as well." *State v. Parker*, 350 S.W.3d 883, 898 (Tenn. 2011). Generally, "*Crawford* bars the admission of testimonial hearsay absent a showing of unavailability and a prior opportunity for cross-examination." *State v. Lewis*, 235 S.W.3d 136, 146 (Tenn. 2007). However, *Crawford* "le[ft] for another day any effort to spell out a comprehensive definition of 'testimonial.'" 541 U.S. at 68.

In *State v. Hutchison*, our supreme court concluded that "'an autopsy report prepared in the normal course of business of a medical examiner's office is not rendered testimonial merely because the . . . medical examiner performing the autopsy is aware that police suspect homicide and that a specific individual might be responsible.'" 482 S.W.3d 893, 914 (Tenn. 2016) (*People v. Leach*, 980 N.E.2d 570, 593 (Ill. 2012)). Under the reasoning in *Hutchison*, autopsy reports generally are not testimonial because their primary purpose is to determine cause and manner cause of death, not to prove the guilt of a particular defendant at trial. *See id.* at 913-14. (Tenn. 2016) (citing *Williams v. Illinois*, 567 U.S. 50, 84 (2012)). Thus, admission of an autopsy report into evidence does not violate the Confrontation Clause. *Id*. at 914. Likewise, the *Hutchison* court concluded that testimony by a substitute expert, who relied on the autopsy report but did not prepare the report, does not violate the Confrontation Clause. *Id*. The *Hutchison* court noted, "Out-of-court statements that are related by the [substitute] expert solely for the purpose of explaining the assumptions on which [the substitute expert's] opinion rests are not offered

- 30 -

for their truth and thus fall outside the scope of the Confrontation Clause." *Id*. (quoting *Williams*, 567 U.S. at 58.

In *Smith v. Arizona*, the United States Supreme Court partially abrogated *Hutchison* by holding, "If an expert for the prosecution conveys an out-of-court statement in support of his opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts." 602 U.S. at 795. In other words, the statement is hearsay. The Supreme Court did not address, though, whether such statements are testimonial. *Id*. at 800-01. Therefore, our supreme court's conclusion in *Hutchison* that the statements are not testimonial remains good law. *See Hodge v. State*, No. W2025-01156-CCA-R28-PC, 2025 WL 2630297, at *3 (Tenn. Crim. App. Sept. 11, 2025) (order), *perm. app. filed* (Tenn. Nov. 10, 2025); *State v. Green*, No. W2024-00370-CCA-R3-CD, 2025 WL 2027873, at *17 (Tenn. Crim. App. July 21, 2025) (Wilson, J., dissenting), *no perm. app. filed*.

Here, like the defendant in *Hutchison*, the Defendant was a suspect and under arrest at the time of the victim's autopsy. The Defendant claimed that he did not harm the victim and that the victim inexplicably went limp while they were playing. We note that the victim's autopsy report, which would have revealed whether Dr. Sago specifically referred to the Defendant, is not in the appellate record. Thus, we conclude that the primary purpose of the victim's autopsy was to determine his cause of death, not to determine whether the Defendant was responsible. Accordingly, even if Dr. Ross conveyed statements from the report that were hearsay pursuant to *Smith*, the statements were not testimonial pursuant to *Hutchison*. In any event, Dr. Ross's testimony and opinions were based mainly on the autopsy photographs. Photographs are not testimonial for purposes of the Confrontation Clause. *Durden v. Macauley*, No. 1:23-cv-13282, 2025 WL 408676, at *4 (E.D. Mich. Feb. 5, 2025) (citing federal cases). Thus, we cannot say that a clear and unequivocal rule of law was breached or that a substantial right of the Defendant was adversely affected.

Additionally, defense counsel asked Dr. Lakin on cross-examination if she reviewed the victim's autopsy report. Dr. Lakin said yes, and counsel proceeded to question her about discrepancies between her testimony and the report. Dr. Lakin acknowledged that Dr. Sago's initial autopsy report did not document any injuries to the victim's spleen or liver and that Dr. Saad's neuropathology report, which accompanied the autopsy report, did not document any retinal hemorrhages. She also acknowledged that the discrepancies showed doctors could have differing opinions about "what they're looking at." Defense counsel later questioned Dr. Ross about the discrepancies between his conclusions and the autopsy report. The Defendant's own expert relied on the autopsy report and used the report to support his opinion. Thus, we cannot say that the Defendant did not waive the issue for tactical reasons.

Finally, consideration of the error, if any, is not necessary to do substantial justice. As stated previously, the evidence against the Defendant was overwhelming. Therefore, the Defendant is not entitled to plain error relief.

## V. Prosecutorial Misconduct

The Defendant claims that the State committed prosecutorial misconduct by questioning Dr. Nelson about payment for his services and by repeatedly questioning him outside his area of expertise. The Defendant also claims that the State's "hostile questions [were] designed to impugn Dr. Nelson's personal character and encourage the jury to reject his testimony on an improper basis and, in doing so, violated principles of due process." The State argues that the Defendant has waived this issue and that he is not entitled to plain error relief. The Defendant responds that the State's prosecutorial misconduct rises to the level of plain error, noting that the trial court compounded the error by not taking any curative measures despite objections by the defense. We agree with the State that the Defendant has failed to demonstrate plain error.

The Defendant did not raise this issue in his motion for new trial. *See* Tenn. R. App. P. 3(e). As stated previously, we may consider an issue to be plain error when a substantial right of the Defendant was adversely affected, and a clear and unequivocal rule of law was breached. *Adkisson*, 899 S.W.2d at 642.

Dr. Nelson, an expert in pediatric neurology, testified that neurologists treated conditions related to the brain, nerves, spinal cord, muscles, and "the connections in between." He said that he reviewed the victim's autopsy report and two neuropathology reports and that the injuries to the victim's brain, spinal cord, and eyes could have been accidental and could have been caused by a single impact to the head, such as from a fall.

On cross-examination, Dr. Nelson testified that he was in the courtroom for Dr. Ross's testimony. The State questioned Dr. Nelson extensively about his opinion that the victim could have suffered one blow to the head, which conflicted with Dr. Ross's opinion that the victim suffered three blows to the head. The State also questioned Dr. Nelson extensively about his opinion that the victim's head injuries could have been accidental in light of the other injuries to the victim's body and questioned him about his fee. Dr. Nelson acknowledged that he did not view the victim's autopsy photographs, explaining that it was not his job to do so because he was a neurologist, not a pathologist, and that his fee was $8,000 per day. The State asked Dr. Nelson about his fee two more times and even remarked, "I think you can give your opinion for $8,000. We're all probably going to get pizza for lunch." Defense counsel objected three times during the State's cross-examination: twice on the basis that the prosecutor was not allowing Dr. Nelson to finish his answers and once on the basis that the prosecutor was questioning Dr. Nelson about the

victim's abdominal injuries, which were outside Dr. Nelson's area of expertise as a neurologist. Regarding the latter objection, the trial court ruled that the prosecutor could "explore" Dr. Nelson's expert opinions because they contradicted the opinions of the State's experts. The trial court noted that Dr. Nelson "has given his opinion on a lot of things that he's not been properly qualified for."

It is well-settled that "the allowance of expert testimony, the qualifications of expert witnesses, and the relevancy and competency of expert testimony are matters which rest within the sound discretion of the trial court." *State v. Rhoden*, 739 S.W.2d 6, 13 (Tenn. Crim. App. 1987) (citing *Murray v. State*, 377 S.W.2d 918, 920 (1964)). Moreover, Tennessee Rule of Evidence 616 provides, "A party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness."

Dr. Nelson testified for the Defendant as an expert in pediatric neurology that the victim's head injuries could have been accidental and could have been caused by a single blow to the head. He based his opinion on the autopsy and neuropathology reports. On cross-examination, the State sought to impeach Dr. Nelson with evidence of the victim's other injuries and the fact that Dr. Nelson did not review the autopsy photographs. Defense counsel objected to the State's questioning Dr. Nelson outside his area of expertise, but the trial court ruled that the State's questions were not improper. We cannot say that the trial court committed plain error. Although Dr. Nelson testified that he was not qualified to offer an opinion based on the photographs because he was not a pathologist, the photographs were part of the same autopsy report that Dr. Nelson obviously thought he was qualified to review in order to render opinions for the defense as to whether the victim's head injuries could have been caused by a single blow to the head and whether the blow could have been accidental.

As to the State's questioning Dr. Nelson about his exorbitant fee, our supreme court has stated that a prosecutor may inquire about an expert's fee to show bias. *See State v. Bush*, 942 S.W.2d 489, 518 (Tenn. 1997). Thus, while the prosecutor's sarcastic comment about Dr. Nelson's fee was improper, the State's questioning him about his fee was not improper. We conclude that the Defendant has failed to show that a substantial right of the Defendant was adversely affected and that a clear and unequivocal rule of law was breached. The Defendant is not entitled to plain error relief.

## VI. 911 Call

The Defendant claims that the trial court erred by not admitting his entire 911 call into evidence under the excited utterance exception to the hearsay rule. He contends that even if his statements during the call were self-serving, the trial court violated his

constitutional right to present a defense by ruling that his statements were inadmissible. The State argues that the Defendant's statements were not admissible under the excited utterance exception because there was evidence that the Defendant did not place the call immediately after the victim was injured and because his relatively calm demeanor and non-responsive, self-serving answers to the 911 operator's questions indicate that he had time for reflection and judgment. The State also argues that the Defendant waived the issue of whether the trial court violated his constitutional right to present a defense because he failed to raise it in his motion for new trial. The Defendant acknowledges that he did not raise the issue of his constitutional right to present a defense in his motion for new trial, and he does not allege plain error concerning the issue. *See* Tenn. R. App. P. 3(e). However, he maintains that his statements in the 911 call were admissible under the excited utterance exception to the hearsay rule and that the error was not harmless. We conclude that the Defendant's statements were not admissible as excited utterances.

Before the Defendant's second trial, the State filed a motion in limine seeking to prohibit the defense from presenting any statements made by the Defendant, including the statements he made in his 911 call, unless the State previously placed the statements into evidence. In support of its motion, the State cited the rule against hearsay provided in Tennessee Rule of Evidence 802 and cited *State v. King*, 694 S.W.2d 941 (Tenn. 1985), and *Hall v. State*, 552 S.W.2d 417 (Tenn. Crim. App. 1977), in which our supreme court and this court held that a defendant's self-serving statements were inadmissible.

The trial court addressed the State's motion prior to opening statements. Defense counsel argued that because the defense's theory was that the Defendant accidentally caused the victim's abdominal injuries when he administered CPR to the victim, the 911 call was relevant to show the manner of CPR he performed. The trial court ruled that the Defendant's statements were hearsay and self-serving and that he could not introduce self-serving statements into evidence pursuant to *King* and *Hall*. The trial court ruled, though, that the operator's CPR instructions to the Defendant were admissible.

Defense counsel later requested to make an offer of proof of the entire 911 call and argued that the Defendant's statements were admissible under the excited utterance exception to the hearsay rule. The trial court did not ask the State to address the defense counsel's excited utterance argument and did not listen to the 911 call. Instead, the trial court said, "Again, if it goes back to the cases that I cited on the record, those are hearsay statements. And it's an out-of-court statement. It's exculpatory. Under Tennessee law, it would be self-serving. And Tennessee law says they are not admissible unless they're offered by the prosecution." Nevertheless, the trial court allowed defense counsel to make an offer of proof of the 911 call for appellate review.

In *King*, our supreme court stated the following regarding a defendant's self-serving statements:

"A self-serving declaration is excluded because there is nothing to guarantee its testimonial trustworthiness. If such evidence were admissible, the door would be thrown open to obvious abuse: an accused could create evidence for himself by making statements in his favor for subsequent use at his trial to show his innocence."

694 S.W.2d at 945 (quoting *Hall*, 552 S.W.2d at 418). "However, no general rule of evidence excludes statements merely because they are self serving. Instead, most self-serving statements are excluded . . . because they constitute inadmissible hearsay." *Phipps v. State*, No. E2008-01784-CCA-R3-PC, 2010 WL 3947496, at *8 (Tenn. Crim. App. Oct. 11, 2010) (internal citation omitted), *no perm. app. filed*; *see also* Neil P. Cohen et al., *Tennessee Law of Evidence*, § 8.08[3][a] n.405 (6th ed. 2011) (stating that "[t]he self-serving nature of the statement is immaterial under . . . most hearsay exceptions").

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay is not admissible during a trial, unless the statement falls under one of the exceptions to the rule against hearsay. *See* Tenn. R. Evid. 802. One of those exceptions is for excited utterances. *See* Tenn. R. Evidence 803(2) (providing that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not excluded by the hearsay rule"). "Underlying the excited utterance exception is the theory that 'circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication.'" *State v. Franklin*, 308 S.W.3d 799, 823 (Tenn. 2010) (quoting *State v. Land*, 34 S.W.3d 516, 528 (Tenn. Crim. App. 2000)). In order for a statement to qualify as an excited utterance: (1) there must be a startling event or condition; (2) the statement must relate to the startling event or condition; and (3) the statement must be made while the declarant is under the stress or excitement from the event or condition. *Land*, 34 S.W.3d at 528-29.

The third requirement includes a variety of considerations:

[T]he court may consider the interval between the event and the statement, the nature and seriousness of the events, and the appearance, behavior, outlook, and circumstances of the declarant. *See State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993). The declarant's circumstances include age and physical or mental condition. [*Kendrick v. State*, 454 S.W.3d 450, 478 (Tenn. 2015)]. "[T]he 'length of time between a startling event and the

statement does not automatically preclude the statement's being admissible as an excited utterance.'" *State v. Banks*, 271 S.W.3d 90, 116-17 (Tenn. 2008) (quoting *Williams v. State*, No. W2006-00605-CCA-R3-PC, 2007 WL 2120174, at *7 (Tenn. Crim. App. July 24, 2007)). The contents of the statement, which might indicate the degree of the declarant's stress, can also be considered. *Kendrick*, 454 S.W.3d at 478. The court may also consider whether the statement is made in response to an inquiry or whether it is self-serving. *Id*. at 479. "[W]hen a statement is made in response to an inquiry or when the statement is self-serving, these factors may show the statement was the result of reflective thought." *Id*. The requirement that the statement be made under stress or excitement "relates most directly to the underlying rationale for the exception." [State v. *Gordon*, 952 S.W.2d 817, 820 (Tenn. 1997)].

*State v. Waggoner*, No. E2018-01065-CCA-R3-CD, 2019 WL 4635589, at *23 (Tenn. Crim. App. Sept. 24, 2019), *perm. app. denied* (Tenn. Feb. 19, 2020). As our supreme court has stated,

> The ultimate test is spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication.

*State v. Smith*, 857 S.W.2d 1, 9 (Tenn. 1993). A trial court's factual findings and credibility determinations regarding hearsay are binding on this court unless the evidence preponderates against them. *Kendrick*, 454 S.W.3d at 479. We review whether a statement is hearsay and whether a hearsay exception applies de novo. *Id*.

We conclude that the trial court erred by ruling that the Defendant's statements on the 911 call were automatically inadmissible on the basis that the statements were self-serving hearsay. The trial court should have listened to the call and considered whether the statements qualified for admission under the excited utterance exception to the hearsay rule.

The Defendant made an offer of proof of the excluded evidence, and we have reviewed the 911 call. The call was received by the 911 operator at 5:51 p.m. and was thirteen minutes, forty-seven seconds in length. At the outset of the call, the Defendant frantically told the 911 operator, "I need an ambulance quick!" and "He's not breathing! His heart's beating, but he's not breathing!" The 911 operator remained on the line but transferred the call to the fire department to address the victim's medical situation. The Defendant told the second operator, "He has a heartbeat, but he's not breathing! Please

come!"  The operator asked the victim's age, and the Defendant responded, "He's two!"  The operator asked if the victim was awake, and the Defendant told her that the victim was not awake and was not breathing.  The operator asked if anything was in the victim's mouth, and the Defendant said, "No.  We was outside playing.  I was throwing him up in the air, and I grabbed him by his leg, and slung him around.  And then, he's, ugh, he's not --."  Before the Defendant could continue, the operator told him to tilt the victim's head back carefully and to put his ear next to the victim's mouth so he could feel or hear the victim breathing.  The Defendant said the victim was not breathing, so the operator instructed the Defendant on mouth-to-mouth resuscitation.  She told him to pinch the victim's nose closed; to cover the victim's mouth completely with his mouth; and to give the victim two breaths, just enough to make the victim's chest rise.

After giving the instructions, the operator waited for the Defendant to perform mouth-to-mouth and asked, "Did you feel the air going in and out?"  The Defendant calmly answered, "When I pressed his stomach only."  The operator repeated the instructions and told the Defendant to give the victim two more breaths.  She told him that she was going to instruct him on chest compressions, and the Defendant said, "I grabbed his leg.  I grabbed his ankle and slung him around.  His head went back.  He never hit anything.  Oh my God!"  The operator told the Defendant to place the heel of his hand on the victim's breastbone in the center of the chest, right between the nipples, and told him to push down about two inches with the heel of his hand.  She told the Defendant to "pump the chest hard and fast thirty times, at least twice per second, let the chest come all the way up between pumps, tell me when you're done."  The Defendant said almost immediately, "Okay.  I'm done."  He then said, "His heart just stopped, y'all."  The operator, sounding frustrated, asked, "Are you doing what I told you to do?"  The Defendant said yes and sounded like he was performing chest compressions. "Oh, God!  Please, D!  Please, D!  Come on, man!  I love you so much, man!  Come on, man!  Come on, man!"  The Defendant told the operator that the victim was not responding, so the operator told him to give the victim two more breaths and thirty pumps of the chest.

The operator waited for the Defendant to perform mouth-to-mouth and the chest compressions.  Six minutes and thirty-four seconds into the call, though, the Defendant suddenly stopped responding to the operator.  Not hearing him, the operator asked, "What are you doing now?  The pumps or the breathing?"  A door slammed, and the operator said, "Hello?"  "Who are you talking to?  Were you talking to me or is someone else there?"  The Defendant, sounding far away, said, "I'm talking to you."  She asked if he was still doing the chest compressions, and he said, "Not yet."  A door slammed again, and a female could be heard asking the Defendant, "How old is he?" and "What's wrong with him again?"  Fourteen seconds later, the Defendant could be heard telling someone, "Open the door."  The Defendant returned to the telephone and sounded out of breath.  He said, "Tell them to come to the back."  The operator asked if the Defendant was "still doing the

pumps," but he did not respond. A door slammed, a female's voice could be heard faintly in the background, and a door slammed again. Ten minutes and thirty-five seconds into the call, the Defendant could be heard saying, "Yeah, come on in! Please! Please, please, please, please, please!" A male voice, presumably a fireman, could be heard talking to the Defendant. The remainder of the call was mostly silence and ended about two and one-half minutes later.

The facts in this case are similar to the facts in *State v. Gray*, 347 S.W.3d 490 (E.D. Mo. 2011). In *Gray*, the three-year-old victim, while in the sole care of her mother's boyfriend, suffered external injuries all over her body and blunt force trauma to her abdomen that caused two large lacerations to her liver. 347 S.W.3d at 496-97. The medical examiner testified that blood loss from the lacerations caused the victim's death; that a sudden, forceful blow such as a kick or a punch would have been necessary to cause the lacerations; and that CPR could not have caused them. *Id*. at 497. On direct appeal of his convictions for second degree murder and child abuse resulting in death, the defendant claimed that the trial court erred by excluding his 911 call as hearsay because his statements were excited utterances and because the exclusion denied him of his right to present a defense, particularly that he called 911 and attempted CPR. *Id*. at 499. The appellate court disagreed, explaining:

> The 911 tape was not admissible under the excited utterance exception to the hearsay rule. Shortly into the call, [the defendant] advised the dispatcher that he had already been performing CPR for 10 minutes. This time period seemingly does not include the time between [the defendant's] alleged discovery that [the victim] was ill and when he began CPR, including taking [the victim] to the bathroom and bathing her. An important factor in determining admissibility is whether the speaker has had the opportunity to fabricate the statement. By the time [the defendant] called 911, [the victim] was in significant distress, for which [the defendant] surely knew he would be asked to account. [The defendant's] self-serving exculpatory statements came at least 10 minutes after the startling event, when [the victim] was showing sufficient signs of distress for [the defendant] to initiate CPR, and provided [the defendant] with ample time to fabricate his statements.

> In addition, while some of [the defendant's] statements were in response to the dispatcher's questions, [the defendant] almost immediately and spontaneously offered substantial information to the dispatcher about the events that had transpired much earlier. Also, the trial court listened to the 911 recording and was able to assess [the defendant's] tone and statements at the time of the declaration.

*Id*. at 500-501.

In the present case, the Defendant told Sergeant Bibbs that he and the victim began playing in the backyard soon after they arrived home from Walgreens, that the victim went limp when he caught the victim by the victim's leg, and that he immediately took the victim into the house and called 911. However, the evidence shows that the Defendant and the victim were in the shed at some point and that the Defendant did not call 911 for more than an hour after he and the victim arrived home. By the time the Defendant called 911, the victim was not breathing, and enough time had passed that the victim had bled into his diaper from intestinal sloughing. We acknowledge that the Defendant sounded frantic during most of his 911 call. Nevertheless, he had ample time to fabricate his story. *See State v. Jones*, No. M2022-01620-CCA-R3-CD, 2024 WL 1252218, at *4 (Tenn. Crim. App. Mar. 25, 2024) (concluding that the record did not preponderate against the trial court's finding that the witness's testimony that the defendant was excited or scared when the defendant made her statement was inadequate to preclude the idea that her statement was deliberate or fabricated), *no perm. app. filed*. Moreover, the Defendant spontaneously told the operator what happened to the victim, and he inexplicably left the victim during the call and could be heard slamming doors and talking to a female when he was supposed to be rendering aid to the victim. Like the defendant in *Gray*, the victim was injured while in the sole care of the Defendant, so the Defendant would have known that he would have to account for the victim's injuries. Under these circumstances, we conclude that the Defendant's self-serving hearsay statements were not admissible under the excited utterance exception.

## VII. Right to Counsel

The Defendant claims that the trial court violated his constitutional right to counsel of choice by denying his request to have retained counsel represent him on his motion for new trial. The State argues that the trial court did not abuse its discretion when it denied the indigent defendant's request to substitute appointed counsel. We conclude that the trial court did not violate the Defendant's right to counsel of choice.

The record reflects that the Defendant's family retained an attorney to represent the Defendant in October 2019 for his first trial. After the first trial ended in a mistrial at the Defendant's request, the attorney left private practice and began working as a public defender. Less than one month later, the Defendant filed a Uniform Affidavit of Indigency. The trial court approved the affidavit and entered an order appointing the same attorney to represent the indigent Defendant at his second trial.

The second jury found the Defendant guilty on all counts, and the trial court held a sentencing hearing on February 14, 2024. After the trial court pronounced the Defendant's

sentences, the trial court stated that attorney William Massey was in the courtroom and that "Mr. Massey is filing a notice of appearance." The trial court asked, "[I]s that for appellate purposes, Mr. Massey?" Mr. Massey answered, "Your Honor, it will probably be for appellate purposes as well. And I would like for the Court to allow me to appear on the motion for new trial." The trial court stated that "[t]hat would be an impossibility, with all due respect" because the trial court had to conduct the motion for new trial hearing within thirty days of the sentencing hearing, which was not enough time for the court reporter to prepare the trial transcripts and for Mr. Massey to investigate the case. Mr. Massey requested permission to ask another court reporter to help prepare the transcripts or that he be allowed to file a "skeleton" motion for new trial while awaiting preparation of the transcripts so that he could represent the Defendant on the motion for new trial. The trial court denied both requests, reiterating that the trial court had to conduct the motion for new trial hearing within thirty days of sentencing. The trial court said that "I will file in the jacket your notice of appearance, but will not allow you to substitute." The trial court stated that the Defendant had a right to counsel of his choice but that the right was not absolute and that it was within the trial court's sound discretion to allow substitution of counsel. The court ordered that appointed counsel continue representing the Defendant on the motion for new trial and said that Mr. Massey could substitute as counsel on direct appeal of the Defendant's convictions if the trial court denied the motion for new trial.

Appointed counsel, who had remained silent during the trial court's exchange with Mr. Massey, asked the trial court to clarify whether the motion for new trial had to be both filed and heard within thirty days. The trial court backtracked from its earlier statements and said, albeit somewhat incorrectly, that the motion had to be filed within thirty days but heard "without undue delay, as soon as possible." *See* Tenn. R. Crim. P. 33(b) (requiring that the motion for new trial be filed within thirty days of the date the sentencing order is entered); *State v. Hatcher*, 310 S.W.3d 788, 804 (Tenn. 2010) (stating that "trial courts should not hold any hearing on a motion for new trial until a reasonable time after the sentencing hearing has been held, sentence has been imposed, and the judgment order entered"); *see also State v. Matthews*, No. M2005-00843-CCA-R3-CD, 2008 WL 2662450, at *10 (Tenn. Crim. App. July 8, 2008) (finding no due process violation in the nine-year delay between the filing of the motion for new trial and the hearing on the motion), *perm. app. denied* (Tenn. Apr. 10, 2015). Appointed counsel advised the court that she had prepared "a draft motion" for new trial and that she planned to file the motion immediately. The trial court ordered that the attorneys appear in court on March 6 to set a date for the hearing on the motion for new trial.

On April 25, 2024, the trial court held the motion for new trial hearing and orally denied the motion. That same day, the trial court entered a written order denying the motion and entered an order allowing appointed counsel to withdraw. The reason given

by the trial court for the withdrawal was that the Defendant "has hired private counsel for appeal."

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right to counsel is "'so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the states by the Fourteenth Amendment.'" *Gideon v. Wainwright*, 372 U.S. 335, 340 (1963) (quoting *Betts v. Brady*, 316 U.S. 455, 465 (1942)). A criminal defendant who is financially able to retain counsel "'should be afforded a fair opportunity to secure counsel of his own choice.'" *State v. Huskey,* 82 S.W.3d 297, 304 (Tenn. Crim. App. 2002) (quoting *Powell v. Alabama*, 287 U.S. 45, 53 (1932)). That said, "[t]he right to be represented by counsel of one's choice is qualified and 'must be balanced against the requirements of the fair and proper administration of justice.'" *Id*. at 305 (quoting *United States v. Micke*, 859 F.2d 473, 480 (7th Cir. 1988)). Denial of the Sixth Amendment right to counsel of choice is structural error, which requires automatic reversal. *United States v. Gonzales-Lopez*, 548 U.S. 140, 148-150 (2006); *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008).

While a nonindigent defendant should be afforded an opportunity to obtain counsel of choice, an indigent defendant has no absolute right to counsel of choice. *Huskey*, 82 S.W.3d at 304-05 (citing *Powell*, 287 U.S. at 53; *United States v. Davis*, 604 F.2d 474, 478 (7th Cir. 1979)). Upon good cause shown, a trial court may allow an attorney who has been appointed to represent an indigent defendant to withdraw. *State v. Branham*, 855 S.W.2d 563, 566 (Tenn. 1993). "[T]he trial court has wide discretion in matters regarding the appointment and relief of counsel, and its action will not be set aside on appeal unless a plain abuse of that discretion is shown." *Id*.

The Defendant claims on appeal that the trial court violated his Sixth Amendment right to counsel of choice because he retained Mr. Massey to represent him for his motion for new trial. At oral arguments, counsel for the Defendant reiterated that "the Defendant hired new counsel" after sentencing. However, there is nothing in the record to support that claim. Mr. Massey never advised the trial court at the sentencing hearing that he had been "retained" or "hired" to represent the Defendant and never filed a notice of appearance as counsel of record. We note that when the trial court asked if Mr. Massey was filing a notice of appearance for appellate purposes, Mr. Massey gave an equivocal response, stating that he would "probably" represent the Defendant on direct appeal. Likewise, neither appointed counsel nor the Defendant informed the trial court at the sentencing hearing that Mr. Massey had been retained to represent the Defendant on the motion for new trial. To the contrary, appointed counsel advised the trial court that she had prepared a draft motion for new trial and that she was planning to file the motion immediately.

Moreover, appointed counsel did not file a motion to withdraw until the trial court denied the Defendant's motion for new trial. Accordingly, we conclude that the Defendant was not denied his right to counsel of choice.

## VIII. Sentencing

The Defendant contends that his effective sentence of life plus fifty years is excessive because the trial court failed to apply the purposes and principles of sentencing properly. Specifically, he claims that the trial court admitted irrelevant and unreliable hearsay into evidence at sentencing, that the trial court relied on its own incorrect recollection of the facts at trial to impose his sentences, that the trial court incorrectly applied an enhancement factor, that the trial court improperly imposed consecutive sentencing without making the appropriate findings pursuant to *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), and that the trial court erred by requiring that he serve one hundred percent of his sentence for aggravated child neglect. The State argues that the trial court properly exercised its discretion when it sentenced the Defendant. We conclude that the Defendant's effective sentence is not excessive but that the trial court erred by ordering that the Defendant serve his sentence for aggravated child neglect at one hundred percent.

The trial court held a sentencing hearing on February 14, 2024, to determine the Defendant's sentences for aggravated child abuse and aggravated child neglect. At the hearing, Aaron Fuller, Sr., testified that on October 2, 2017, he was driving north on Kirby Parkway when he encountered the Defendant, who was also driving north on Kirby. The Defendant's vehicle was in the left lane, Mr. Fuller's truck was in the middle lane, and a third vehicle was in the right lane. Mr. Fuller said the Defendant was talking on the telephone and was moving his vehicle into Mr. Fuller's lane, so Mr. Fuller "did a polite tap" on his horn to get the Defendant's attention. The Defendant rolled down his window, pointed a large pistol toward Mr. Fuller and Mr. Fuller's passenger, and told Mr. Fuller to pull over. The Defendant said, "I've got something for you and for him." Mr. Fuller said he "backed off," took a photograph of the Defendant's license plate, and telephoned the police. The police later met up with Mr. Fuller at a Mapco gas station and told him that they had apprehended the Defendant. Mr. Fuller identified the Defendant in the courtroom as the man who pointed the pistol at him. At the conclusion of Mr. Fuller's testimony, the trial court noted that the Defendant had been charged with two counts of aggravated assault as a result of the incident and that his attorney for that case was in the courtroom.

Ms. Hence, the victim's daycare teacher, testified that on the morning of April 12, 2018, the Defendant dropped off the victim at First Step Learning Academy. When Ms. Hence later arrived at the daycare, she saw that the victim had injuries to his bottom lip and inside his mouth. Ms. Hence did not talk with the Defendant. Instead, "an older child," who was not enrolled at the family-owned daycare but had been checking-in children that

morning, told Ms. Hence that the Defendant claimed the victim fell out of the Defendant's car and onto the ground. Ms. Hence filled out an Accident Report form for the daycare in which she explained how the victim was injured. Over the Defendant's hearsay objection, the trial court allowed the State to introduce the form into evidence. Ms. Hence also photographed the victim's injuries, and she identified the photographs for the trial court. The photographs showed the victim with a split bottom lip and bleeding inside his bottom lip. On cross-examination, Ms. Hence testified that the daycare director notified the victim's mother about the victim's injuries and that Ms. Hence would have talked with the victim's mother when the victim's mother arrived at the daycare.

The victim's paternal family submitted a victim impact statement to the trial court. Dyrone Johnson, the victim's father, was present in the courtroom and tried to read his own victim impact statement aloud. However, he became too emotional to continue, so the State finished reading the statement for him. In his statement, Mr. Johnson said that the Defendant was a danger to society and requested that that the Defendant "remain in custody for as long as the law shall allow to ensure the safety of others."

The State introduced the Defendant's presentence report into evidence. According to the report, the then forty-five-year-old Defendant was divorced, a high school graduate, and pursued a business finance degree at the University of Memphis but dropped out his junior year. The report showed that the Defendant worked as an operations manager for PharMedium from February 2015 until he was arrested in this case and that he worked as a distribution manager for AmeriPride from January 2013 until January 2015. The report confirmed that as a result of the incident with Mr. Fuller, the Defendant was charged with two counts of aggravated assault. At the time of the report, the aggravated assault case was still pending and was scheduled for a hearing. The report also showed that the Defendant was convicted of violating the rules of the road in December 1997. The Defendant's Strong-R assessment classified his overall risk to reoffend as low.

The trial court noted that the Defendant was a Range I, standard offender for aggravated child abuse in count one and aggravated child neglect in count three and that the range of punishment for those Class A felonies was fifteen to twenty-five years. *See* Tenn. Code Ann. § 40-35-112(a)(1). The trial court stated that it was required to consider the evidence presented at the sentencing hearing, including the Accident Report that had been admitted into evidence over the Defendant's objection. The trial court said it also had considered the factors in Tennessee Code Annotated section 40-35-210, the facts and circumstances of the case, the nature and characteristics of the criminal conduct involved, the presentence report, the statements and arguments of counsel, the statistical data provided by the Administrative Office of the Courts, the Defendant's risk and needs assessment, and the Defendant's potential for rehabilitation or treatment. For the next fourteen pages of the transcript, the trial court summarized the evidence presented at trial.

After the trial court's summary, the trial court found that enhancement factor (1), "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," applied to the Defendant's convictions based on prior arrests listed in the presentence report and based on the aggravated assaults of Mr. Fuller and Mr. Fuller's passenger. *Id*. at § 40-35-114(1). The trial court also applied enhancement factors (4), the victim was particularly vulnerable because of age; (5), "[t]he defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense"; and (14), the defendant abused a position of private trust that significantly facilitated the commission or the fulfillment of the offense. *Id*. at § 40-35-114(4), (5), (14). The trial court gave all of the factors great weight. In mitigation, the trial court concluded that the Defendant was entitled to "slight" consideration for his consistent work history. *See id*. at § 40-35-113(13). The trial court found that the enhancement factors "significantly" outweighed the mitigating factor and sentenced the Defendant to twenty-five years each for the aggravated child abuse and aggravated child neglect convictions. Regarding consecutive sentencing, the trial court found that the Defendant was a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. *See id*. at § 40-35-115(b). The trial court ordered that the Defendant serve his twenty-five-year sentences consecutively to each other and to the life sentence for first degree felony murder.

This court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012); *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013) (applying the *Bise* standard of review to consecutive sentencing). In determining a defendant's sentence, the trial court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Defendant in his own behalf; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. Tenn. Code Ann. § 40-35-210(b); *see also Bise*, 380 S.W.3d at 697-98. The burden is on the Defendant to demonstrate the impropriety of his sentences. *See* Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory factors are advisory only. *See* Tenn. Code Ann. § 40-35-114; *see also Bise*, 380 S.W.3d at 701; *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Id.* at 346.

Initially, the Defendant contends that we should review the sentences imposed by the trial court de novo because the trial court failed to properly apply the purposes and principles of sentencing. However, the court specifically referenced the relevant sentencing statutes, gave detailed findings, and stated its reasons for the sentences imposed. Therefore, we review the trial court's sentencing determinations for an abuse of discretion with a presumption of reasonableness.

We first address the Defendant's claim that the trial court erred by admitting Ms. Hence's accident report into evidence. The Defendant notes that "the traditional rules of evidence are relaxed [at sentencing], and the trial judge may admit 'trustworthy and probative' evidence, 'regardless of its admissibility under the exclusionary rules of evidence.'" *State v. Flynn*, 675 S.W.2d 494, 498 (Tenn. Crim. App. 1984) (quoting *State v. Mackey*, 553 S.W.2d 337, 344 (Tenn. 1977)). He claims, though, that Ms. Hence's obtaining information from an unnamed child was unreliable hearsay. We question the trustworthiness of information given to Ms. Hence from a child whose identity and age are unknown. In any event, the trial court did not mention the accident report during its pronouncement of the Defendant's sentences and appeared to give the report little, if any, weight. Therefore, we conclude that the Defendant is not entitled to relief on this issue.

The Defendant also claims that the trial court incorrectly stated during its extensive summary of the evidence that the victim suffered three skull fractures when the proof at trial showed that the victim suffered one skull fracture. The State asserts that the trial court "misspoke." We have carefully reviewed the sentencing hearing transcript. By our count, the trial court said seven times at sentencing that the victim sustained three skull fractures: four times during the court's extensive summary of the proof at trial and twice during the court's pronouncement of the Defendant's sentences. Therefore, the record does not support the State's argument that the trial court "misspoke." Regardless, the proof at trial showed that the victim suffered three impacts to the head that resulted in three brain bleeds, not three skull fractures. The trial court's comments at sentencing demonstrate that the difference in three skull fractures and three brain bleeds would not have altered the trial court's sentencing decisions.

Next, the Defendant claims that the trial court erred by applying enhancement factor (1), the Defendant has a previous history of criminal behavior, in addition to those necessary to establish the appropriate range. The Defendant contends that the trial court relied on mere arrests to apply the factor. He also contends that the proof failed to show by a preponderance of the evidence that he committed aggravated assault during the incident with Mr. Fuller because it is not illegal to carry a firearm in Tennessee and because Mr. Fuller did not testify that he feared imminent bodily injury.

In applying enhancement factor (1), the trial court stated, "He has several arrests or citations on his record. Most of those were nolle prosequi. But it is, in fact, criminal behavior." However, a mere arrest or criminal charge does not constitute "criminal behavior" within the meaning of Tennessee Code Annotated section 40-35-114(1). *State v. Carico*, 968 S.W.2d 280, 288 (Tenn. 1998). Therefore, the trial court should not have applied enhancement factor (1) based on mere arrests.

The trial court also applied enhancement factor (1) based on the Defendant's aggravated assaults of Mr. Fuller and Mr. Fuller's passenger. Relevant to this case, aggravated assault occurs when a person intentionally or knowingly causes another to reasonably fear imminent bodily injury by using or displaying a deadly weapon. Tenn. Code Ann. §§ 39-13-101(a)(2), -102(a)(1)(A)(iii). A firearm is a "deadly weapon." *Id*. at § 39-11-106(a)(6). "[F]acts relevant to sentencing must be proven by a preponderance of the evidence and not beyond a reasonable doubt." *State v. Winfield*, 23 S.W.3d 279, 283 (Tenn. 2000).

In applying enhancement factor (1) based on the aggravated assaults, the trial court stated that it was not making a legal determination as to the Defendant's guilt but that the State had presented proof of the crimes by a preponderance of the evidence. We agree with the trial court. Mr. Fuller testified that the Defendant pointed a gun at him and his

- 46 -

passenger and that the Defendant said he had something for them. Mr. Fuller testified that he "backed off" and that he telephoned the police. In *State v. Atkins*, No. 03CO1-9812-CC-00432, 1999 WL 1019029, at \*3 (Tenn. Crim. App. Nov. 10, 1999), *perm. app. denied* (Tenn. Apr. 10, 2000), this court concluded that the jury was entitled to infer the victim was fearful because the victim retreated and called the police after the defendant brandished a knife and threatened the victim. Thus, although the trial court erred by applying enhancement factor (1) based on the Defendant's mere arrests, the trial court properly applied the enhancement factor based on the aggravated assaults.

Regarding consecutive sentencing, the Defendant claims that the trial court found him to be a dangerous offender without making the appropriate *Wilkerson* findings. A trial court may order that multiple sentences run consecutively if it finds by a preponderance of evidence that the defendant is a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing crimes in which the risk to human life was high. Tenn. Code Ann. § 40-35-115(b)(4). When the court bases consecutive sentencing upon the dangerous offender classification, it must also find that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences reasonably relate to the severity of the offense committed. *State v. Lane*, 3 S.W.3d 456, 460-61 (Tenn. 1999); *Wilkerson*, 905 S.W.2d at 937-38.

In finding the Defendant to be a dangerous offender, the trial court stated as follows:

Dangerous offender. And this behavior absolutely indicates little regard for human life, and he had no hesitation in committing this crime in which the risk to human life was high. And not only was the risk to human life high in this case, the child died as a result of what [the Defendant] did.

And in order to make that discretionary finding under State versus Wilkerson, . . . the Court has to make some additional findings.

One, that the circumstances surrounding the commission of the offense are aggravated.

Again, I state emphatically, I know nothing that would be more aggravated. I know nothing that would more senseless. I know nothing that would be more brutal. I know nothing that would be more unconscionable. I know nothing that would be more of a crime against the peace and dignity of the State of Tennessee or any other state than the killing of a two and a half year old child that you claim you treat as your own son, that you're trusted to protect to keep safe while Geandra Meeks goes to work. Leaves

- 47 -

that child in your possession, and you reward her trust by bludgeoning and killing this child.

I don't know what else could be more aggravating than what happened to this two and one-half year old child.

The Court also has to find that the aggregate length of the sentences are reasonably related to the severity of the offense for which the Defendant stands convicted and are necessary in order to protect the public from further criminal acts by the Defendant.

The child's father and the family, so upset, so hurt. The pain will live with them for the rest of their lives, every second, every day, every week, every month, every year for that child, who spent a very brief time on this earth, will cast a shadow and the pain that those folks will carry forever.

His father could not even finish reading a victim impact statement some almost five years ago, six years ago. Still carrying that pain. Still carrying that hurt. Cannot even read a victim impact statement in court today. [The State] had to finish reading his thoughts. Saying [the Defendant] needs the maximum sentence that you can impose.

And, again, I will not *say* it is the right sentence, because I don't know what sentence you give somebody that bludgeons a child, that kills a child, that snuffs out the life of a two and a half year old who is buoyant, who is joyous, who loves trains, loves Disney, loves his friends, loves his family, full of life. What's an appropriate sentence for somebody who murders a baby?

The circumstances surrounding this sentence, this crime, are, in fact, aggravated. And I will state unequivocally and emphatically if [the Defendant] is not a defendant for whom consecutive sentences should be applied, under the facts of this case, under the circumstances of this case, under the totality of all the factors I placed on the record, if [the Defendant] is not the person, not the, if you will, poster child for consecutive sentences, I don't know what crime, I don't know what offense, I don't know what sentencing guidelines that a trial court should consider that says this is the case that our legislature, that our appellate courts say this is a case that applies under the *Wilkerson* factors.

And I do find that he is, in fact, a dangerous offender. He had

absolutely no hesitation in killing this child. Had absolutely no hesitation in bludgeoning this child. Based on the proof in this case had no hesitation in either slamming this child's head into something or kicking this child or striking this child so hard that it broke ribs and tore internal organs in a place on that child's body that are very, very difficult to cause injury to.

The Defendant claims that the trial court failed to explain how an extended sentence is necessary to protect the public from further criminal conduct by him. Although the trial court explained how consecutive sentencing reasonably relates to the severity of the offenses, the trial court did not address whether an extended sentence is necessary to protect the public from further criminal conduct. In that situation, we can conduct our own de novo review. *Pollard*, 432 S.W.3d at 864.

The Defendant had known the two-year-old victim since the victim was six months old, and Ms. Meeks trusted the Defendant to care for the victim. On the day of his death, the victim was afraid of the Defendant and begged not to leave the daycare with him. The Defendant took the victim home and literally beat him from head to toe. The victim's injuries included a skull fracture, a subdural hematoma, a subarachnoid hematoma, retinal hemorrhages, multiple rib fractures, and a hematoma around his duodenum that extended more than two feet. Some of the injuries were inflicted by the Defendant's kicking or punching the victim. The Defendant then waited until the victim was not breathing to call 911 and left the victim lying alone on the den floor. To this day, despite overwhelming evidence of his guilt, the Defendant has not accepted any responsibility for his actions or expressed any remorse. Therefore, we conclude that an extended sentence is necessary to protect the public against further criminal conduct by the Defendant. The trial court did not err by ordering consecutive sentencing.

Finally, the Defendant claims that the trial court erred by ordering that he serve his sentence for aggravated child neglect at one hundred percent. The Defendant contends that the sentence is in direct contravention of Tennessee Code Annotated 40-35-501(i)(2), which lists offenses for which a defendant "shall serve one hundred percent (100%) of the sentence imposed by the court less sentence credits earned and retained" pursuant to Tennessee Code Annotated section 40-35-501(i)(1), because aggravated child neglect is not one of the listed offenses. *See* Tenn. Code Ann. § 40-35-501(i)(2).

The trial court stated that the Defendant was to serve his sentences for aggravated child abuse and aggravated child neglect at one hundred percent, and the trial court marked the box for "§ 40-35-501(i) 100%" under the release eligibility section of the judgment form. At the time of the offenses, though, Tennessee Code Annotated section 40-35-501(k)(6)(B) (2014) provided:

There shall be no release eligibility for a person committing aggravated child neglect or endangerment as defined in § 39-15-402, on or after July 1, 2014, until the person has served eighty-five percent (85%) of the sentence imposed by the court, less sentence credits earned and retained. However, no sentence reduction credits authorized by § 41-21-236, or any other law, shall operate to reduce below seventy percent (70%) the percentage of sentence imposed by the court such person must serve before becoming release eligible.

*See State v. Boykin*, No. W2018-01207-CCA-R3-CD, 2019 WL 5269026, at *16 (Tenn. Crim. App. Oct. 17, 2019) (stating, "When a defendant is convicted of aggravated child neglect or endangerment, the release eligibility is eighty-five percent (85%")) (citing Tenn. Code Ann. § 40-35-501(k)(6)(B) (2015)), *perm. app. denied* (Tenn. Feb. 26, 2020). Therefore, the Defendant's release eligibility for aggravated child neglect is eighty-five percent, and we remand the case to the trial court for entry of a corrected judgment in count three. The trial court is to unmark the box for "§ 40-35-501(i) 100%" and mark the box for "aggravated child neglect/endangerment 85%" under "release eligibility." The Defendant's sentence of life plus fifty years is affirmed in all other respects.

## IX. Cumulative Error

The Defendant contends that the cumulative effect of the trial court's numerous errors at trial and at sentencing prevented him from receiving a fair trial.

The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial.

*State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (citations omitted). The cumulative error doctrine only applies when there has been more than one error committed during the trial proceedings. *Id*. at 77.

We have determined that the trial court committed harmless error by saying that the trial court was granting a continuance when the Defendant actually requested a mistrial during the first trial and by automatically excluding the Defendant's self-serving hearsay statements on the 911 call during the second trial. However, we conclude that the cumulative effect of the two errors did not affect the trial proceedings, particularly in light of the overwhelming evidence of the Defendant's guilt for first degree felony murder in the perpetration of aggravated child abuse, aggravated abuse, and aggravated child neglect. We have also determined that the trial court committed errors during sentencing.

Cumulative errors at sentencing may warrant a new sentencing hearing even though individual errors do not require relief. *State v. Molly L. Miles*, No. 03C01-9812-CR-00447, 1999 WL 1191535, at *11 (Tenn. Crim. App. Dec. 16, 1999) (citing *State v. Cribbs*, 967 S.W.2d 773, 789 (Tenn. 1998)). Despite the trial court's sentencing errors, we have concluded that the Defendant's effective sentence of life plus fifty years is not excessive. Therefore, he is not entitled to any relief based on cumulative error.

## CONCLUSION

Upon our review, we conclude that the evidence is insufficient to support the conviction of first degree felony murder in the perpetration of aggravated child neglect and that the judgment of conviction must be corrected to reflect the correct release eligibility for aggravated child neglect. Therefore, the Defendant's conviction of first degree felony murder in the perpetration of aggravated child neglect in count four is reversed, and the case is remanded to the trial court for correction of the judgment for aggravated child neglect in count three. The Defendant's remaining convictions and effective sentence of life plus fifty years are affirmed.

s/ John W. Campbell
JOHN W. CAMPBELL, SR., JUDGE

- 51 -